**KEMIN INDUSTRIES, INC., Appellee,**

v.

**KPMG PEAT MARWICK LLP a/k/a Peat Marwick Main & Co., Appellant.**

No. 96–1093.

Supreme Court of Iowa.

May 28, 1998.

Thomas D. Hanson, Fred E. Beaver, and Clark G. McDermott of Hanson, Bjork & Russell, L.L.P., Des Moines, and Donald W. Rose, New York City, for appellant.

Patrick M. Roby and Christopher L. Bruns of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellee.

Rex J. Ryden of Cartwright, Druker & Ryden, Marshalltown, and Richard I. Miller, New York City, for amicus curiae American Institute of Certified Public Accountants.

W. Don Brittin, Jr. of Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, P.C., Des Moines, for amicus curiae Iowa Society of Certified Public Accountants.

Considered by HARRIS, P.J., and LARSON, CARTER, LAVORATO, and ANDREASEN, JJ.

CARTER, Justice.

KPMG Peat Marwick (Peat Marwick), a public accounting firm, appeals from a $2.95 million money judgment entered against it in an action brought by its client, Kemin Industries, Inc. (Kemin). As grounds for reversal, Peat Marwick contends that (1) those responsible for Kemin's financial affairs had knowledge of the items that it claims Peat Marwick failed to uncover in its audit; (2) the district court applied an improper standard of care in ruling on Peat Marwick's motion for directed verdict and in its instructions to the jury; (3) Kemin's evidence failed as a matter of law to show that any omission by Peat Marwick was a proximate cause of injury to Kemin; and (4) the jury's verdict may not be reconciled with the court's instructions.

Kemin has cross-appealed, asserting that the district court erred in setting aside the jury's breach-of-contract finding on posttrial motions and thereby basing the judgment against Peat Marwick solely on a negligence theory that allowed reduction of damages based on comparative fault. It also contends that no comparative fault reduction should have been imposed by the court even if the case is viewed as a negligence action. After reviewing the record and considering the arguments of the parties, we reverse the judgment of the district court and remand the case for a new trial.

Kemin is a manufacturer and processor of a number of products used as agricultural feed additives and feed treatments. One of its primary customers was a Mexican company, Pabsa/Idea (Pabsa), that distributed Kemin's products in that country. Kemin is wholly owned by the R.W. Nelson family. During the time pertinent to this litigation, its management consisted of R.W. Nelson, president and chief executive officer; his son, Chris Nelson, vice president for research and development; Robert Wagstaff, vice president in charge of sales; John Long, treasurer and chief financial officer; and Douglas Cagwin, comptroller.

The company's chief contact on the Pabsa account was William Peterson, its Latin American sales manager. Kemin's chief financial officer, John Long, was a certified public accountant. Its staff also included Tammi Guldenpfenning, a certified public accountant formerly employed by Peat Marwick whom Kemin had hired as a financial analyst.

Peat Marwick is a public accounting firm that had been the auditor for Kemin for more than ten years prior to conducting the 1992 audit that is at issue in this case. Johnny Danos was the engagement partner of Peat Marwick responsible for the 1992 audit. Ray Scheve was the audit manager, and Jeanne Van Arb was the staff accountant supervising the field work for the 1992 audit.

Kemin's claim against Peat Marwick is founded on the assertion that the auditor's failure to discover and disclose certain irregularities concerning the Pabsa account receivable caused Kemin to delay intensive collection efforts until the account receivable had become uncollectible. The Pabsa account involved two products, Oro Glo, an extract of Marigold plants used as a chicken

feed additive to improve the color of eggs, and Mycocurb, which is used to treat feed grains for purposes of inhibiting mold activity. Some of the Pabsa accounts were with Pigmentos, a Mexican subsidiary of Kemin, but, for purposes of this litigation, all Pabsa accounts were considered to be owed directly to Kemin.

The relationship between Kemin and Pabsa experienced a rapid growth. Pabsa accounts receivable on December 31, 1991, amounted to $933,985. On the ending date of the disputed Peat Marwick audit, December 31, 1992, this receivable had increased to $3,551,000. At one time, Kemin required documentary letters of credit as security for Pabsa's account receivable. These letters of credit were drawn down on an invoice-by-invoice basis. That system was replaced by the use of standby letters of credit issued by American banks that could be availed of by Kemin when the Pabsa account was delinquent for a specified number of days. A standby letter of credit in the sum of $400,-000 was issued by a Houston, Texas, bank on September 24, 1991, and renewed on September 23, 1992. It expired on October 23, 1992. A $200,000 standby letter of credit was issued by another Texas bank on February 20, 1992. It expired on June 14, 1992.

Peat Marwick's work on the 1992 Kemin audit commenced on December 21, 1992. A preliminary audit report was discussed at a meeting on February 15, 1993, with key officers of Kemin, including R.W. Nelson and John Long. Peat Marwick's engagement partner, Johnny Danos, testified that he discussed the size and overdue status of the Pabsa receivable with Kemin's management at this time and questioned its collectibility. John Long, chief financial officer for Kemin, confirmed that these items were discussed at this meeting and testified that he was not surprised at the amount of the Pabsa receivable. In-house financial documents prepared each month had reflected the rate at which it was increasing. Although R.W. Nelson indicated that he did not recall discussion of the Pabsa account at the February 15 meeting reviewing the preliminary audit, he did admit that it was discussed the following day at a meeting of Kemin's board of directors, which he attended.

Prior to December 31, 1992, John Long, Robert Wagstaff, and William Peterson became aware that the $400,000 and $200,000 letters of credit had expired. Also aware of this fact was Doug Cagwin, the company comptroller. It was the testimony of Peterson, Wagstaff, and Long that it was Cagwin's responsibility, in keeping with the company's credit policies for the Pabsa account, to obtain a new standby letter of credit in the sum of $1,400,000. They also testified that Cagwin had assured them that he had done so and had the letter of credit from Pabsa's American bank on file in his office. In fact, no new letter of credit was obtained after the $400,000 and $200,000 letters of credit had expired.

Peat Marwick offered as evidence at trial a memorandum written by Peterson that indicated he had also informed company president R.W. Nelson that the $200,000 and $400,000 letters of credit had expired. R.W. Nelson testified that he believed that Cagwin had secured a new standby letter of credit in the increased sum of $1,400,000. He stated that it was not until May 10, 1993, that he or any other company official, other than Cagwin, knew that this letter of credit did not exist.

Kemin's written credit policy for customer accounts provides "[c]redit limits, approved by the president, will be assigned to all open accounts." During the first eleven months of 1992, the credit limit approved for Pabsa under this policy was $200,000, with payment terms of forty-five days. R.W. Nelson testified that this meant that the account receivable could exceed letters of credit on file by $200,000. On December 16, 1992, Pabsa officials requested that this limit be increased to $800,000, with payment terms of ninety days. R.W. Nelson testified that he approved this increase. At this time, the account balance was approximately $2,500,000, which exceeded the newly increased credit limit even if the $1,400,000 letter of credit had been in place. This circumstance was aggravated when, shortly thereafter, an additional $1,000,000 worth of Kemin products was sold to Pabsa on credit.

In preparing the 1992 audit report, the Peat Marwick staff did not inquire as to the existence of letters of credit. Peat Marwick representatives, Ray Scheve and Jeanne Van Arb, testified that they were never advised by anyone from Kemin that any letter of credit existed. Kemin's financial analyst, Tammi Güldenpfenning, testified that she did tell Jeanne Van Arb in the early stages of the audit that Kemin had a letter of credit backing the Pabsa account. R.W. Nelson testified that he advised the engagement partner, Johnny Danos, that the Pabsa account was backed by a letter of credit on February 15, 1993. Danos denied this in his testimony.

A certified public accountant testified as an expert witness for Kemin. It was his conclusion that, in performing the 1992 Kemin audit, Peat Marwick had improperly failed to discuss the significance of three insufficient funds checks that Kemin had received from Pabsa with Kemin's chief executive officer. He also testified that Peat Marwick had employed improper methods in verifying the value of Pabsa's account receivable and should have uncovered the absence of any letters of credit. We will discuss the testimony of Kemin's expert witness in more detail in our consideration of the legal issues presented. Another certified public accountant testified as an expert witness for Peat Marwick and contradicted some of the contentions of Kemin's expert. The district court submitted the case to the jury on both breach-of-contract and negligence theories. It permitted the jury to find Peat Marwick at fault for (1) its manner of reporting the three insufficient funds checks, (2) its failure to uncover the absence of the letter of credit, and (3) its expression of the value of Pabsa's account receivable. The jury found for Kemin on both contract and tort theories.

On the tort claim, the jury found that the percentage of fault attributable to Kemin was thirty-five percent. It found that Kemin had suffered total damages of $4,004,472, of which $3,876,061 represented the loss of the Pabsa account receivable. On the contract claim, the jury found Kemin's total damages to be $3,896,471.[1] Following the trial, the district court, in ruling on Peat Marwick's posttrial motions, concluded that the issue should have been submitted to the jury solely on tort theories and that the amount of damages awarded should be reduced by Kemin's percentage of contributory fault. This resulted in a judgment being entered against Peat Marwick in the sum of $2,947,799. Other facts significant to the disposition of these appeals will be considered in our discussion of the legal issues presented.

### I. Whether Peat Marwick May Be Held Liable for Failing to Report Operational Information Known to Officers and Employees of Kemin.

Peat Marwick contends that it should not be held liable for failing to report operational information of which key employees of Kemin were otherwise aware. In support of this contention, it relies on the decisions in *FDIC v. Ernst & Young*, 967 F.2d 166 (5th Cir.1992); *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir.1982); *Seidman & Seidman v. Gee*, 625 So.2d 1 (Fla.Dist.Ct. App.1992); *Delmar Vineyard v. Timmons*, 486 S.W.2d 914 (Tenn.Ct.App.1972).

The *Cenco* and *Gee* cases invoked the doctrine of "*in pari delicto*" to bar claims against a public accounting firm for fraudulent acts of its client. We have recognized and applied this doctrine in *General Car & Truck Leasing System, Inc. v. Lane & Waterman*, 557 N.W.2d 274, 279–80 (Iowa 1996). In the present case, the doctrine of *in pari delicto* was not presented to the jury as a defense. Peat Marwick now suggests that the elements of this doctrine are applicable because the purposes of Cagwin's deception was to deceive lending institutions in order to gain advantage for Kemin. Because that theory was not raised in the district court, we may not consider it on appeal.

In the *Ernst & Young* and *Delmar Vineyard* cases, the court imputed knowledge of corporate officers to the corporations for purposes of negating the corporations' claims

---

1. The difference in amounts allowed for tort damages and contract damages arose from the jury's disallowance on the contract claim of any expenses incurred in collection efforts, an item that had been allowed on the tort claim.

that they had relied to their detriment on the opinions of their accountants. In the present case, Kemin's expert witness testified that the discovery by Peat Marwick of three insufficient funds checks totaling more than $362,000 in December 1992 should have prompted its auditing staff to immediately contact Kemin's chief executive officer, R.W. Nelson, concerning that situation. On cross-examination, this witness amended that opinion so as to acknowledge that Peat Marwick could properly investigate the situation surrounding these checks before acting. Peat Marwick's investigation of these checks revealed that Kemin had promptly pressed Pabsa for payment and that in January 1993, while the audit was pending, Pabsa had wired money in the sum of $242,318 to cover two of these checks. These facts were known to the company comptroller and to the chief financial officer, John Long. Based on this state of facts, we do not believe that a jury issue was presented based on Peat Marwick's failure to bring the matter of the insufficient funds checks to the attention of the company president.[2]

Kemin's expert witness also testified that, in conducting the audit at issue here, Peat Marwick's technique in establishing the proper amount for accounts receivable was flawed and not done in accordance with generally accepted auditing standards. This conclusion was premised on his view that the verification of accounts receivable was done by means of an inadequate sampling process. However, Kemin makes no claim that the amount of the Pabsa account receivable on December 31, 1992, as stated in Peat Marwick's audit report, was in any way erroneous. Kemin relied on that sum as evidence of its damage claim.

With respect to the collectibility of the Pabsa account, Peat Marwick expressed some skepticism as to the age and potential collectibility at the time of its February 15, 1993 preliminary audit report. As a result, the account was discussed the next day at a meeting of Kemin's board of directors. Ke-

min contends that later in 1993, Cagwin deceptively understated the amount of the Pabsa account receivable and financial reports prepared for other company officials. Peat Marwick's audit was for the calendar year ending December 31, 1992. It reported the Pabsa account receivable on that date in an amount not now challenged by Kemin. Any subsequent reliance by Kemin on in-house financial statements prepared by Cagwin later in 1993 is clearly not Peat Marwick's responsibility.

Based on the knowledge that the corporation gained through those officers and employees whose duties were to act on the matters known, we conclude that the evidence failed to present a jury issue as to Peat Marwick's negligence or breach of contract based on its handling of the insufficient funds checks or evaluation of the Pabsa account receivable. Had Peat Marwick moved to withdraw those two issues from consideration of the jury, that motion should have been granted. However, Peat Marwick only moved for a directed verdict on all claims and did not separately challenge the claims pertaining to the insufficient funds checks and the evaluation of the account. As to the motion that was made, we believe it was properly denied based on the evidence surrounding the nonexistent letter of credit.

We have concluded in several cases that the knowledge of an officer or employee of a corporation is imputed to that corporation when the information is pertinent to the duties of the officer or employee receiving it. *Regal Ins. Co. v. Summit Guar. Corp.*, 324 N.W.2d 697, 704 (Iowa 1982); *Rohlin Constr. Co. v. Lakes, Inc.*, 252 N.W.2d 403, 405 (Iowa 1977). We recognized an exception to this rule, however, in *Regal* with respect to situations in which the only agent with knowledge of the fact in issue has completely abandoned the interests of the corporation so as to act to its detriment. *Regal*, 324 N.W.2d at 704. The record contains the testimony of several witnesses that officers of the corporation,

---

2. In its jury instruction on this issue (Instruction No. 22), the trial court did not submit an issue to the jury based on an alleged failure to report the insufficient funds checks to the chief executive officer. It required Kemin to establish a failure to report the checks to "Kemin's senior management." We deem it to be an inescapable conclusion that several members of Kemin's senior management had knowledge of the insufficient funds checks.

other than Cagwin, knew that the previous $400,000 and $200,000 letters of credit had expired, but were assured by Cagwin that he had obtained a newly issued letter of credit payable through Norwest Bank in the sum of $1,400,000. There was further evidence that the corporation relied to its detriment based on that assurance by granting further credit to Pabsa. We conclude that, if the only officer or employee of a corporation with knowledge of a false assertion is the party making the false assertion, that person's knowledge of the falsity is not imputed to the corporation. We also conclude that the issue of whether, in performing its audit, Peat Marwick should have discovered that no letter of credit existed and advised officials at Kemin other than Cagwin of this fact was, on the evidence presented, for the jury to decide. We discuss this matter more fully in considering the instructions concerning Peat Marwick's standard of care.

## II. *Whether Generally Accepted Auditing Standards and Generally Accepted Accounting Principles Completely Define the Scope of Responsibility of a Public Accounting Firm.*

Peat Marwick argues that a public accounting firm may only be found to have acted negligently in an auditing engagement if it is shown that specific standards established by the American Institute of Certified Public Accountants have been violated. These standards are generally accepted auditing standards (GAAS) and generally accepted accounting principles (GAAP). The auditing standards set forth how an auditor is to go about obtaining the required information and the accounting principles set forth the format in which to present the information.

■ We are unable to accept the argument that the formalized standards of the American Institute of Certified Public Accountants are the only measure of professional negligence with respect to auditing activities. In reaching this conclusion, we are aware that the professional licensing and regulating division of the department of commerce has adopted regulations requiring that

in expressing opinions concerning financial statements all certified public accountants in this state shall adhere to the principles expressed in GAAS and GAAP. 193A Iowa Admin. Code. r. 11.4(2), 11.4(3). Rule 11.4(1) of these administrative directives defines competency of a certified public accountant as follows:

> A CPA ... shall not undertake any engagement for the performance of professional services which the accountant or accountant's firm cannot reasonably expect to complete with due professional competence, including compliance, where applicable, with [GAAS and GAAP].

That definition does not suggest that compliance with GAAS and GAAP are the only professional standards to which certified public accountants are held in providing services to their clients.

We believe that the situation may be likened to that which exists concerning the rules of professional responsibility for lawyers. Violation of a duty owed to a client under those rules may be the basis for a finding of professional malpractice toward the client. *See Cornell v. Wunschel,* 408 N.W.2d 369, 377 (Iowa 1987); *Whiteaker v. State,* 382 N.W.2d 112, 116 (Iowa 1986). But, this is not the only basis for establishing that a breach of professional duty has occurred. Rules of professional practice must to a considerable extent be cast in general terms and cannot conceive of all situations in which a professional's actions might be deemed unreasonable.

We recognized in *Schmitt v. Clayton County,* 284 N.W.2d 186 (Iowa 1979), with respect to engineering standards for public bodies:

> [T]he duty of the [public agency] is of a general nature, involving an exercise of due care under the circumstances.... While engineering knowledge and skills may well be utilized by the [public agency] in fulfilling its obligation, the ... obligation is stated in broader terms. Compliance with recognized or, in the case of the manual, statutorily mandated engineering procedures would be most relevant to whether [the public agency] has properly discharged its function. [Its] duty is not

necessarily coterminous with [an] engineer's professional judgment.

*Schmitt,* 284 N.W.2d at 189. In the later case of *Gipson v. State,* 419 N.W.2d 369 (Iowa 1988), we discussed the *Schmitt* case with approval and stated "the legal obligation of the public body [as to highway design standards] continues to be a duty of 'ordinary care under the circumstances.'" *Gipson,* 419 N.W.2d at 372.

In the present case, the district court instructed the jury as follows in Instruction No. 14:

> You have received evidence of provisions of certain accounting procedures and standards of that profession called Generally Accepted Accounting Procedures (GAAP) and Generally Accepted Auditing Standards (GAAS). Conformity with an applicable procedure or standard is evidence that Peat Marwick was not negligent and non-conformity is evidence that Peat Marwick was negligent. Such evidence is relevant and you should consider it, but it is not conclusive proof.

The trial court further instructed the jury as follows in Instruction No. 17:

> In performing an audit, an accountant is under a duty to use the skill, judgment and learning ordinarily possessed and exercised by other accountants under similar circumstances.

We believe that these instructions in combination properly set forth the correct legal standards for adjudicating the negligence claims presented.

■ In applying these standards to Kemin's claim of negligence with respect to the nonexistence of letters of credit, we are satisfied that if the evidence is viewed most favorably toward Kemin the issue was for the jury. There was evidence that Peat Marwick was concerned with the size of the Pabsa receivable. It represented forty-three percent of Kemin's net worth. If the jury believed that Kemin's financial analyst, Tammi Guldenpfenning, advised Peat Marwick's senior auditor that the account was secured by a letter of credit, it could also have concluded based on the testimony of Kemin's expert witness that the exercise of appropriate professional judgment required the auditors to verify the existence of the letter of credit. An effort by the auditors to obtain a copy of the letter of credit for their working papers would in all likelihood have uncovered Cagwin's deception in December 1992, more than four months earlier than its eventual discovery in May 1993. For reasons we discuss later in this opinion, the jury could have reasonably believed that if Kemin had learned in December that this very large account was completely unsecured, it would have cut off future credit sales to Pabsa and proceeded to successfully collect some or all of the unpaid balance on the account, thereby sustaining a lesser loss on the account than it otherwise did.

### III. *Whether the Evidence Permitted a Finding that the Pabsa Account was Collectible for Purposes of Kemin's Damage Claim.*

■ Peat Marwick urges that the evidence was insufficient to permit the jury to find that the Pabsa receivable was collectible at any time pertinent to Kemin's claim for damages. We agree this is an element that Kemin had to establish in order to recover. That has been the rule in other cases involving failure to collect an amount owed due to professional negligence. *See Burke v. Roberson,* 417 N.W.2d 209, 212 (Iowa 1987); *Pickens, Barnes & Abernathy v. Heasley,* 328 N.W.2d 524, 526 (Iowa 1983). We consider this argument in combination with a separate argument by Peat Marwick that the jury's finding as to Kemin's loss on the Pabsa account receivable is irreconcilable with the instructions to the jury. The latter argument was made the object of a motion for new trial by Peat Marwick.

Peat Marwick urged in a motion for directed verdict and in a posttrial motion for judgment notwithstanding the verdict that Kemin's evidence failed to show that the Pabsa account receivable would have been collectible even if Peat Marwick had discovered the absence of the letter of credit and so advised Kemin. In considering that contention, it becomes necessary to fix a time at which the alleged discovery and reporting duty would have arisen. Under the district court's In-

struction No. 36, it was left entirely to the jury to fix this time. That instruction provided as follows:

> In order for the plaintiff, Kemin Industries, to recover damages from Peat Marwick as to the Pabsa account receivable, Kemin must prove:
>
> 1. Peat Marwick was obligated to report information to Kemin management which would have initiated collection procedures on the account receivable;
>
> 2. The disclosure of information by Peat Marwick to Kemin management, if required, was to be made on a date, no earlier than December 21, 1992, as determined by the jury based on the evidence;
>
> 3. That Kemin would have initiated collection procedures to collect the Pabsa account receivable on that date or within a reasonable time after receiving the information;
>
> 4. The amount of the Pabsa account receivable on the date the jury determines disclosure was required and Kemin would have initiated collection procedures; and
>
> 5. The amount of the Pabsa account, if any, which Kemin would have reasonably collected from Pabsa, as determined by the jury, but not to exceed the amount of the account receivable existing on the date determined by the jury under paragraph 4 above.
>
> If Kemin has proved all of these elements it is entitled to recover damages for loss of the Pabsa account receivable....

In considering whether the account was collectible, it was Kemin's theory that the time Peat Marwick's discovery and disclosure concerning the nonexistent letter of credit should have occurred was in December 1992. Peat Marwick denied that it had any obligation to investigate the purported letter of credit and report to Kemin's senior management with respect thereto. It also urged that, if such an obligation did exist, it had a reasonable period of time, beyond December 31, 1992, to take that action. Kemin's evidence concerning collectibility of the account was targeted at the situation surrounding Pabsa's financial condition in December 1992. Under the theory presented in the trial court's instructions, Kemin was placed on the horns of a dilemma. It not only had to show that the account was collectible at the time Peat Marwick should have uncovered the absence of the letter of credit but also had to show that the account became uncollectible shortly thereafter.

The district court's denial of Kemin's motion for directed verdict on the basis that the account was uncollectible was legally justified because the evidence would support a finding that the account was at least partially collectible in December 1992 and for a limited period of time extending into 1993. That is so because Pabsa did make some payments on the account in January, February, and March of 1993. Although the evidence that the account was fully collectible in December was not strong and would have allowed a contrary finding, the jury could have found that the account was fully collectible at that time. The evidence does not support a finding that it was fully collectible after December 31, 1992.

The verdict was itemized and the amount attributable to the loss of the Pabsa account was $3,876,061. That figure was within a few dollars of the full balance of the Pabsa account on February 28, 1993. The account balance had not been that high at any time prior thereto. Peat Marwick finished its final audit report on February 25, 1993. If, as part of its auditing responsibility it had a duty to discover and report the absence of a letter of credit, that duty had to arise during the time that the audit was taking place.

Based on the circumstances that we have discussed, we conclude that Peat Marwick is correct in contending that, under the evidence, the verdict cannot be reconciled with Instruction No. 36 and still find support in the evidence. The amount of the verdict that the jury attributed to the loss of the Pabsa account receivable strongly suggests that the jury fixed the time of Peat Marwick's negligence and its duty to report at a time when the account was not collectible or at least was not fully collectible. If the jury had fixed December 1992 (the only time that the evidence established the account to be fully collectible) as the time when the negligence occurred, the unpaid balance of the account

at that time was less than the amount attributed to the account in the verdict. Moreover, substantial payments were made by Pabsa on the December 1992 account balance during January, February, and March.

In resisting Peat Marwick's motion for new trial, Kemin argues that the jury's verdict was not necessarily based on the size of the account at the time that the negligence occurred. It suggests that the verdict could have been based on a theory that, because of Peat Marwick's negligence, Kemin extended new credit to Pabsa in 1993 that would not have been forthcoming had it known the letter of credit did not exist. Under that theory, Kemin argues, the time that the negligence occurred and the account balance on which damages were based did not have to coincide. Although this would have been an acceptable theory concerning how Kemin might have been damaged, there is absolutely no way that the court's Instruction No. 36 permitted the jury to reach a verdict based on that theory.

Paragraph four of Instruction No. 36 required the jury to determine "the amount of the Pabsa account receivable on the date the jury determines disclosure was required." A prior paragraph of that instruction required the jury to determine "that Kemin would have initiated collection procedures to collect the Pabsa account receivable on that date or within a reasonable time after receiving the information." Paragraph five of the instruction requires the jury to determine "the amount of the Pabsa account, if any, which Kemin would have reasonably collected from Pabsa, as determined by the jury, but not to exceed the amount of the account receivable existing on the date determined by the jury under paragraph four [of the instruction]." Any lingering doubt that the jury's award of damages was limited to the amount of the collectible portion of the account on a date on or about the time the negligence occurred is removed by a reading of Instruction No. 34. That instruction told the jury that the loss for the unpaid account should be based on "its inability to collect the Pabsa account receivable, from a date certain to be decided by the jury based on other instructions."

For the reasons stated, we conclude that Peat Marwick is entitled to a new trial in which the jury's verdict is more tightly channeled towards a time at which the account receivable was demonstrated to be collectible under the evidence. The district court may choose to instruct on the theory, now urged by Kemin, involving the increase in the amount of the Pabsa account after the auditors should have discovered the absence of the letter of credit thus prompting a denial of future credit to Pabsa.

### IV. Kemin's Cross–Appeal as to Application of Comparative Fault Principles.

On its cross-appeal, Kemin contends that the court should have entered judgment on the jury's verdict on its contract claim unreduced by the amount of its own comparative fault as determined on the negligence claim. It advances two reasons for this contention: (1) that the comparative fault law contained in Iowa Code chapter 668 is inapplicable to actions that only seek recovery for economic loss, and (2) that in this multicount litigation it was entitled to a separate verdict based on breach of contract.

In support of its first contention, Kemin relies on the federal court decision in *Ethyl Corp. v. BP Performance Polymers, Inc.*, 33 F.3d 23 (8th Cir.1994), applying Iowa law. In that case, the court determined that the comparative fault principles established in chapter 668 did not apply to a breach-of-warranty claim seeking entirely economic losses. The court indicated its belief that under Iowa law a claim for purely economic loss is recoverable only in contract and not in tort. It relied for this conclusion on *Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 123–25 (Iowa 1988). Our reading of the *Nelson* decision indicates that it was limited to deciding whether purely economic injuries without accompanying physical injury are recoverable under a theory of strict liability in tort. *Nelson*, 426 N.W.2d at 123. The case does not speak to the specialized situation of professional negligence.

■ Fault is defined as follows in Iowa Code section 668.1(1) (1995):

As used in this chapter *"fault"* means one or more acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability.

The loss of general business revenues would appear not to be "property of the actor or others," so as to be included in this definition. But, a specifically identified account receivable, which can be established in a specific amount under the evidence in the case, is a chose in action. We are satisfied that a chose in action is sufficiently recognized in our law as property, *see. Gartin v. Taylor*, 577 N.W.2d 410 (Iowa 1998) (recognizing that chose in action is property that may be transferred); Iowa Code § 626.21 (providing for the transfer of a chose in action in satisfaction of a judgment), that a negligent act destroying the chose satisfies the statutory definition of fault.

■ With respect to Kemin's second contention, it acknowledges that a professional negligence claim against an accounting firm may be brought under a tort theory. This was approved in *American Trust & Savings Bank v. United States Fidelity & Guaranty Co.*, 439 N.W.2d 188, 190 (Iowa 1989). Kemin argues, however, that a tort recovery is not the exclusive form of action. When both breach-of-contract and tort theories are advanced, Kemin argues, the jury should be permitted to render a verdict on both, and the plaintiff should then be able to claim the benefit of the most favorable theory of recovery on which a favorable verdict is rendered.

At first glance, it may appear that Kemin's contention is supported by *Woods v. Schmitt*, 439 N.W.2d 855 (Iowa 1989). In that case, an action was brought against an attorney for both breach of contract and negligence based on an alleged failure to discover a cloud on the title to real estate when examining the abstract for the buyers. The jury returned a verdict against the attorney on both contract and negligence theories. In connection with the negligence verdict, the jury also found the buyers to be guilty of contributory fault of thirty-five percent. The district court permitted the plaintiff to accept judgment on the full amount of the contract

verdict with no reduction for comparative fault. We affirmed that determination. *Woods*, 439 N.W.2d at 867. Although that was the result in *Woods*, the contract verdict in that case was not challenged in the district court and had to be accepted by this court as a fait accompli. In the present litigation, the district court set the contract verdict aside on Peat Marwick's motion.

We believe that Kemin's theory is analogous to an argument that this court rejected in *Long v. Jensen*, 522 N.W.2d 621 (Iowa 1994). In that case, a guest who fell on steps at a friend's residence sued the friend's landlord based on a covenant of repair in the lease. Both negligence and breach-of-contract theories were presented to the jury, and the jury found defendant to be liable on both theories. On the negligence claim, the plaintiff was found to be guilty of comparative fault of thirty-five percent. The guest argued that because the jury found for her on her contract theory she should not suffer any reduction in the damages awarded. In rejecting that contention, we held that the clause in the lease merely established a duty element of a negligence cause of action and that the comparative fault reduction of the plaintiff's recovery was warranted. *Long*, 522 N.W.2d at 624. We are satisfied that the same principle should be applied in the present litigation.

Almost all relationships involving professional services arise from an offer and acceptance that would constitute a simple contract. Nevertheless, a claim that a provider of professional services has failed to meet the standard of care that the law has placed on that party is essentially a negligence cause of action. To hold otherwise would render inapplicable those provisions of chapter 668 that are specifically tailored to actions involving professional negligence. *See* Iowa Code §§ 668.11 (disclosure of expert witnesses in cases involving licensed professionals), .12 (statute of repose as applied to licensed engineers and architects).

We have considered all issues presented and conclude that, for the reasons discussed in division III of this opinion, the judgment of the district court should be reversed and the case remanded to that court for a new

trial on all issues. Costs of appeal are assessed to Kemin.

**REVERSED AND REMANDED.**