John E. DOWNS, Ruth Driscoll, Fran Spink, formerly Fran Creach, Nadine Luley and Nonie Smith, Plaintiffs in Error,

v.

LONGFELLOW CORPORATION, Defendant in Error.

No. 38672.

Supreme Court of Oklahoma.

May 3, 1960.

Floyd L. Walker, Philip K. Blough, Tulsa, for plaintiffs in error.

Hudson, Hudson, Wheaton & Kyle, Tulsa, for defendant in error.

JACKSON, Justice.

This is a consolidated action by several former tenants of the Longfellow apartment house in Tulsa, Oklahoma, against the owner and operator thereof to recover damages for loss and damage of personal property arising out of a fire which virtually destroyed the apartment house on the night of April 24, 1956. At the close of plaintiffs' evidence, the trial court sustained defendant corporation's demurrer thereto, and plaintiffs appeal.

The decisive question is whether plaintiffs' evidence construed liberally in favor of plaintiffs, is sufficient to support a reasonable inference that the fire was proximately caused by defendant's negligence.

Plaintiffs' theory is that the fire was caused by defective or inadequate electrical wiring and fusing installed and maintained by defendant, resulting in overloading of the electrical circuits when appliances were used by the tenants.

Alton Robertson, Jr., the building maintenance engineer, testified, in substance, as follows:

That the apartment house had three floors and a penthouse. There were business offices on the first floor and apartments on the second and third floors. The electrical fuse boxes, with a large number of screw-in type fuses, were located on the third floor. There was an attic or crawl space above the third floor, in which were located electrical conduits, water and steam pipes. There were nine fan houses on the roof, containing fans driven by one-horsepower 220-volt electric motors. The fans were not in operation on the night of the fire. The circuits running to the fans had 30-ampere fuses. There were two fused circuits for each apartment, one for the ceiling lights and one for the wall outlets. The circuits for Apartments 330 and 331 had 20-ampere fuses. All other apartments had 15-ampere fuses. The wall outlets in Apartments 330 and 331 may have been

connected to the same fused circuit. Plaintiff Nonie Smith was occupying Apartment 325, "the corner one", on the night of the fire.

Plaintiff Nonie Smith testified, in substance, as follows:

She occupied Apartment 331, in the southeast corner of the third floor, on the night of the fire. She owned and used various electrical appliances, including a television, steam iron, cooker, coffee maker, toaster, and clock-radio. Prior to the night of the fire she had encountered difficulty with the operation of her appliances—they would momentarily stop working, the lights would dim, and the electric plugs would get hot, when she used more than one appliance at the same time. She had reported this difficulty to the apartment house manager and maintenance engineer. On the night of the fire, she had been using her television, table lamps and steam iron for a period of about two-and-a-half hours, until about 11:30 o'clock p. m. When she disconnected the iron, she noticed that the plug and wall outlet were so hot that she could not remove the plug with her bare hand. Later that night she heard a commotion and within a few minutes discovered that flames had broken through the kitchen ceiling of her apartment, and the entire kitchen was engulfed in smoke. On cross-examination, she stated that she was not positive which apartment she occupied on the night of the fire—that it could have been No. 325.

Plaintiffs Ruth Driscoll, Nadine Luley and Fran Spink testified generally that they had had trouble with blown fuses, poor television reception and dimming lights, and that certain appliance plugs and wall outlets became warm or hot when the appliances were being used. When plaintiff Nadine Luley first noticed the fire, it was coming down through the vents in the third floor hallway ceiling.

Glen Holmes, Chief Electrical Inspector, Tulsa County, testified, in substance, as follows:

The maximum quantity of electricity that can be safely conducted through Size 14 wire is 15 amperes, and, therefore, such a circuit should have a 15-ampere fuse. If appliances are used on such a circuit which draws more electricity than the circuit is designed to carry, the circuit will become overloaded, resulting in the blowing of the 15-ampere fuse. If the circuit has a 20-ampere fuse, the circuit could become overloaded to the extent that the wire would get hot enough to ignite a fire. When appliance plugs and wall outlets become heated, that is an indication that the circuit is overloaded. (It was stipulated that Size 14 wire was used throughout the apartment house.)

On direct examination, Mr. Holmes was asked the following hypothetical question:

"Q. (By Mr. Walker) Mr. Holmes, I would like for you to assume, if you will, a situation where a fire occurs in a brick apartment building located at 1019 South Main Street at approximately 1:00 o'clock a. m. on the morning of April 24, 1956; that this apartment building is so constructed that there are commercial establishments on the ground floor; that on the second floor and on the third floor were apartment houses in which people lived, and there was a pent house projecting up above the roof of the third floor in which there was either one or two other apartments, which made a sort of a fourth floor; that the electrical circuits for this particular building were controlled by fuse boxes on the third floor, where the sub-feeders from the main electrical service and panels would feed into the fuse boxes, one at the west end and one at the east end of the building; that there were many rows of screw-type electrical fuses in this panel, and that from the panel on the third floor the Size 14 wire went out from that to transport the electricity from the panel to the various apartments located on the third floor of this apartment house. Further take into consideration the fact that on many occasions, at least on one occasion prior to the fire, that Size 20 amp fuses had been

placed in some of the circuits there in this electrical fuse box, and that the evidence shows that there were no fuses in there in excess of 30 amps—most of them were either 15 or 20 amp fuses. Further assume that on many occasions, or several occasions, prior to the night of the fire and prior to April 24, 1956, the tenants had reported difficulty in the use of various electrical appliances, the difficulty at times consisting of their electric light bulbs being extremely short lived or they did not last very long, and one of the complaints that the tenants had was that on occasion when they would plug in one of their electrical appliances, it would cause the lights in their apartment to dim, whenever they would attempt to use an appliance and have the lights on at the same time. You will further assume that after using some types of electrical appliances, such as I told you a while ago, the toaster or the iron or an electric roaster, the user would find that the plug where it plugged into the wall receptacle and the wall receptacle itself had become hot or warm to the touch. Further consider, please, sir, that the construction of this building was such that immediately over these third floor apartments was an attic space; at the west end, or on the Main Street end, of the building there was a crawl space of some thirty-six inches in depth, and that it gently sloped to the rear or to the alley to where the crawl space in the attic was some six inches in height; that there were ceiling joists of one by twelve material; that down below between the ceiling joists had been placed some insulating material immediately over the ceilings of the various apartments; that the only way that you could get into this attic crawl space would be by removing a grille and going through one of the ventilating openings into one of the apartment houses or would be to go through the fan houses which were located on the top of the apartment house building, and the evidence showed that Mr. Robertson on occasion had entered into the attic through these fan houses on the top of the building. The evidence further showed that the only thing in this attic was water

lines, for hot and cold water, were steam lines and were electrical lines leading from these fuse boxes to the various apartments to distribute the electrical current. Now, take further into consideration that in the hours immediately preceding the occurrence of this fire on the morning of April 24, that one of the tenants in the building had been engaged in ironing some of her clothing and belongings over a period of an hour and a half to two hours; that she had stopped her ironing at something like 11:30 o'clock at night; that at the time that she had stopped ironing, she had disconnected the iron from the wall receptacle and had noticed that the end of the plug or the end of the appliance cord was quite warm to the touch, as was the wall receptacle. Now then, please, sir, taking into consideration those facts and the further fact that at the time the fire was first noticed by the tenants in the building, that the fire was coming down through these various grilles and burning down from the attic in through the ceiling into the hallway and into the various apartments, could you, please, sir, form an opinion, based upon those facts, as to the most probable and logical cause of ignition of this fire?" His answer was:

"In my opinion, it was an overloaded circuit that caused the fire."

On further examination, he stated that low voltage in the electricity supplied to the entire apartment house could also cause the plug to get hot, as would a loose connection in the circuit, plug, or a defective appliance cord, regardless of the size of the wire. In arriving at his opinion that the cause of the fire was an overloaded circuit, he assumed that there was no loose connection or defective cord and he assumed that the cause of the fire was an overloaded circuit.

W. L. Thornton, Ass't Fire Chief, City of Tulsa, testified, in substance, as follows:

He was on duty the night of the fire, and received the call at 12:57 o'clock a. m. April 25, 1956. Upon arriving at the scene, he observed that the whole roof and back end of the building was on fire. Entering the

building, he observed the fire coming down out of the ceiling vents. In his opinion, the fire started around the roof or penthouse. The next day he observed that the electrical wiring was insulated Size No. 14, with knob and tube construction—that is, holes were bored through the joists and a porcelain tube inserted, through which the wire was placed, and porcelain knobs were nailed or screwed to the wood members to hold the wire.

On direct examination, he was asked the following hypothetical question:

"Q. Now then, I would like to have you take into consideration the following and assume as being true the following facts, and that is that this fire which you observed, and I would like to have you take into consideration your observation of the location of the fire at the time that you arrived on the scene, and in addition to your observation as to where the fire was burning at that time, I would like for you to take into consideration the following facts: That is, that prior to the fire, the electrical sub-circuits going from the electrical fuse boxes on the third floor of this apartment and leading to the various apartments had been fused with fuses of varying capacity, from 15 to 30 amps, but most of them were either 15 or 20 amp fuses; that prior to the night of the fire, the tenants of the building had had complaints or difficulties wherein they had reported their light bulbs burned out very quickly or were short lived; they had reported they had difficulty in the use of various kinds of electrical appliances, including electric roasters or coffee pots and electric irons, and that on some occasions when they were using more than one of the appliances, they would have an electric fuse on their circuit blow, where they would have to be replaced, and on other occasions when they had used an appliance over a period of time, they would find that the plug that was inserted into the wall receptacle would become warm or hot to the touch and also that the wall receptacle, at least on one or two occasions, the tenants reported, found them hot to the touch; that on this particular night, the tenant in

Apartment 331, which was the corner apartment at the alley and Eleventh Street—that is, the southeast apartment right next to the street, was still awake at the time that the fire was discovered; that prior to the time that she had discovered the fire, for some two hours or two and a half hours she had been engaged in using an electric steam iron; that she had used it and left it connected for a considerable period of time; that at the same time, her television set was turned on and was running; that at the time she disconnected her electric iron, she discovered that the wall receptacle and the plug which had been inserted into the wall receptacle was hot or warm to the touch. Now then, please, sir, based upon those facts, the assumption of those facts, can you tell the Court and jury whether or not you are able to form an opinion as to the cause of this fire?"

His answer was:

"* * * it was an overloaded circuit."

On cross-examination, the witness admitted that, in testifying in 1956 in a companion case arising out of the same fire, he testified as follows:

"Q. Now, then, please, sir, did you for your own information make an investigation and an attempt to determine what the cause of this particular fire was for your own information?

"A. Well, ordinarily—no, I did not."

During cross-examination in the instant case, the following then transpired:

"The Court. * * * Apparently you did not, from what you just said, form an opinion as to the causation of this fire until sometime after the investigation when this gentleman discussed it with you; is that correct?

"A. That was right, yes."

Considering plaintiffs' evidence in its most favorable light to plaintiffs, it tended to show the following facts: Nonie Smith was occupying one of the apartments which had a 20-ampere fuse on a circuit of Size 14 wire. On the night of the fire, she was

using appliances which could have overloaded the circuit. When she disconnected the iron, about an hour-and-a-half prior to the discovery of the fire, the plug and wall outlet were hot.

The effect of witness Holmes' testimony was that the hot plug and wall outlet could have been caused by (1) an overloaded circuit, (2) low voltage, (3) loose connection, (4) defective plug, or (5) defective appliance cord.

■ Neither Holmes nor Thornton gave any reasons for their opinions that the fire was caused by an overloaded circuit, rather than by any one of the other four, non-actionable, causes, any one of which could have caused the plug and wall outlet to become hot.

In 32 C.J.S. Evidence § 569, p. 403, it is stated:

"Reasons and facts supporting opinion. The reasons given in support of the opinions rather than the abstract opinions are of importance, and the opinion is of no greater value than the reasons given in its support. If no rational basis for the opinion appears, or if the facts from which the opinion was derived do not justify it, the opinion is of no probative force, and it does not constitute evidence sufficient to authorize submission of the issue to the jury or to sustain a finding or verdict, * * *."

And, at page 407:

"The weight of the opinion is also affected by the reasons and facts on which it is based, and the absence of a substantial basis for the opinion renders it of little value. So testimony which is merely speculative or conjectural is of no value, and is insufficient to support a finding."

■ It is fundamental that a plaintiff, in order to impose liability upon a defendant, is required to establish, by a preponderance of the evidence, that the defendant was guilty of negligence which probably, not merely possibly, caused plaintiff's injury.

In an annotation in 66 A.L.R., at page 1517, the author states:

"A plaintiff, in order to impose upon a defendant any obligation or liability, is required to establish by a preponderance of the evidence the facts essential to his right to relief. It is not enough in this respect to produce evidence sufficient to show a possibility of the existence of the necessary facts. Verdicts must rest on probabilities, not on mere possibilities. There is not capacity in any number of the latter to create the former. If the proof is as consistent with the theory that the injury was due to a cause not actionable as with the theory that it was due to an actionable cause, the case fails to come within the province of the jury. The court is not required to submit evidence which will merely enable the jury to guess at a fact in favor of a party who was bound to prove it. Ely v. Pittsburgh, C. C. & St. L. R. Co. (1893) 158 Pa. 233, 27 Atl. 970. If, when the plaintiff rests his case, the facts which it was incumbent upon him to establish appear from the evidence as merely possible, the court should grant a motion of nonsuit. * * *."

And, at page 1518:

"Hence, it is that where the plaintiff's case rests upon the testimony of a witness whose further examination so explains or qualifies his prior testimony as to leave the fact to which he testifies a matter of conjecture, possibility, or guess, his testimony will be construed as a whole to be so lacking in probative force as not to make a case for the jury. In such circumstances, the defendant, as a matter of law, is entitled to the direction of a verdict."

■ It may be conceded that an essential fact may be proved by circumstantial evidence, but such evidence must have suf-

ficient probative value to constitute the basis for a legal inference rather than mere speculation, and the circumstances proved must lead to the conclusion with reasonable certainty and probability.

As stated in 32 C.J.S. Evidence § 1039, p. 1101:

"The conclusion must be a reasonable and probable one, and must follow logically from the facts. The circumstances must, of course, agree with and support the hypothesis which they are adduced to prove; but circumstantial evidence is not sufficient to establish a conclusion where the circumstances are merely consistent with such conclusion, or where the circumstances give equal support to inconsistent conclusions, or are equally consistent with contradictory hypotheses."

■ This is not to say that a plaintiff generally has the burden of proving that his injury was not, or could not have been caused by factors other than the negligence of the defendant. But where he relies upon circumstantial evidence to prove causation, the circumstances proved must tend to support plaintiff's theory with reasonable certainty and probability, as opposed to other causal hypotheses.

In Highway Const. Co. v. Shue, 173 Okl. 456, 49 P.2d 203, we said, in the syllabus:

"1. A verdict of a jury must be said to be based upon speculation and conjecture when, after considering all the evidence favorable to plaintiff, together with all inferences to be reasonably drawn therefrom, and excluding all evidence favorable to defendant, all unprejudiced minds must agree, from the facts and circumstances in evidence, that any one of several conclusions consistent with nonliability of defendant may as reasonably be drawn therefrom as is the conclusion of liability under plaintiff's theory of the case."

And, at page 205 of the Pacific Reporter opinion:

"It is a matter of equality or inequality of probabilities, and we mean real,

logical probabilities, based upon established facts, as opposed to speculation and guesswork. We must exclude all those tempting, so-called probabilities which are the result of heaping inference upon inference. While one reasonable inference resulting from a proven fact or facts may be treated as evidence in itself, it cannot be utilized as a basic proven fact for the generation of further, additional inferences."

■ Conceding that plaintiffs' evidence was sufficient to support an inference that the circuit was overloaded, which caused the plug and wall plate to become hot, still, it was insufficient to support the further inference that the overloaded circuit caused the fire. The evidence shows that the circuit wire was insulated, and conducted through and around wood members by means of porcelain tubes and knobs. There is no evidence reasonably tending to show that an overheated circuit wire probably caused the fire in the building.

In Lukenbill v. Longfellow Corporation, Okl., 329 P.2d 1036, which was a similar action arising out of the same fire as the instant case, we affirmed judgment of the trial court sustaining defendant's demurrer to plaintiff's evidence. At page 1038 of the opinion, we said:

"The evidence sufficiently established negligence by defendant in over-fusing the sub-circuits so that they could become hot. But to connect this negligence to the fire which occurred, two additional conclusions are necessary; one, that a sub-circuit was overloaded on the evening of the fire; two, that the fire originated from an electric sub-circuit. It is here that the proof fails. * * *

"This barrier has been the reef upon which many actions have foundered. And in this action it is not hurdled by suggesting that because the fire originated in the attic it could have occurred from an over-loaded electric sub-circuit; the evidence must reasonably tend to prove that it did occur in that manner."

In the instant case, plaintiffs have succeeded in adducing sufficient evidence to support an inference that a circuit was overloaded on the night of the fire, but they have failed to show that the fire probably resulted from an overloaded circuit.

 Plaintiffs argue that the trial court should have submitted the case to the jury under the theory of res ipsa loquitur, though not pleaded nor raised at the trial. We are cognizant of the rule that where there is competent evidence that a certain thing, which was under the exclusive management and control of defendant, caused the injury, the burden may be placed upon defendant to rebut the inference that the injury would not have occurred except for defendant's negligence. Southwest Ice & Dairy Products Co. v. Faulkenberry, 203 Okl. 279, 220 P.2d 257, 17 A.L.R.2d 1373. In that case, plaintiffs, operators of a grocery store, recovered damages for loss of business profits resulting from the public discovery of a dead mouse in a bottle of milk procured by plaintiffs from defendant.

In affirming, we held that the res ipsa loquitur doctrine was properly invoked to imply negligence of the defendant. It will be noted that it is negligence, not causation, that is inferred under the doctrine. The presence of the dead mouse in the bottle of milk as the cause of plaintiff's damages was *proved*. That causal fact could not have been *inferred* upon proof that plaintiffs were damaged and that their damage could have been caused by a dead mouse in a bottle of milk.

██ As we held in the syllabus of Smith v. Vanier, Okl., 307 P.2d 539:

"Before the doctrine of res ipsa loquitur may be invoked to justify the inference of negligence on the part of the defendant, the plaintiff must prove what caused the damage, and that the 'thing' causing said damage was under the control and management of the defendant or his servants, since the doctrine does not go to the extent of im-

plying that one may, from the mere fact of injury, infer what physical act produced the injury."

██ For reasons heretofore stated, we are of the opinion that the evidence adduced by plaintiffs is insufficient to support an inference that the fire was probably caused by a thing which was under the exclusive management and control of defendant. The doctrine of res ipsa loquitur, is therefore, not applicable.

Judgment affirmed.