2001 OK 76

Steve STROUD, an individual, and Stroud Crop, Inc., an Oklahoma corporation, Appellees/Counter-appellants,

v.

ARTHUR ANDERSEN & CO., a partnership, Appellant/Counter-appellee.

No. 92,033.

Supreme Court of Oklahoma.

Sept. 18, 2001.

Supplemental Opinion on Denial of Rehearing Dec. 4, 2001.

Kenneth W. Klingenberg and George H. Brown of Klingenberg & Associates, Oklahoma City, OK; David B. Coffin, Dallas, Texas; Barry K. Roberts, Norman, OK; and Stanley M. Ward, Norman, OK, for the appellees/counter-appellants.

Kenneth N. McKinney, Robert D. Tomlinson and A. Michele Campney of McKinney & Stringer, Oklahoma City, OK; and Philip Allen Lacovara and Joanne E. Benisch of Mayer, Brown & Platt, New York, NY, for the appellants/counter-appellees.

Edwin F. Garrison of Looney, Nichols & Johnson, Oklahoma City, OK; Louis A. Craco and Richard L. Klein of Wilkie Farr & Gallagher, New York, NY; and Richard I. Miller, General Counsel of the American Institute of CPA's, New York, NY, for amicus curiae American Institute of Certified Public Accountants.

J. Angela Ables, James W. Rhodes and Kevin R. Wisner of Kerr, Irvine, Rhodes & Ables, Oklahoma City, OK, for amicus curiae Oklahoma Society of Certified Accountants.

LAVENDER, J.

¶ 1 Resolution of today's cause requires the Court (1) to ascertain for comparative-negligence purposes the relevance of a *plaintiff's* negligence when a *professional's* [1] performance is faulted in a negligence action and (2) to decide whether there is competent evidence in the record which would sustain the jury's verdict.

## I.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Steve Stroud, individually, [Stroud] and Stroud Crop, Inc. [SCI] brought an action against Arthur Andersen & Co. [Andersen or defendant], a professional accounting firm, seeking damages for economic injuries allegedly emanating from flawed audits of SCI and Insurance Company of the Prairie States' [ICOPS] financial statements.[2] The audits were prepared by Andersen. Stroud over a period of years had built ICOPS into one of the larger providers of crop insurance in the United States. SCI was the general managing agent and operator of ICOPS. Both companies were owned primarily by Stroud and their indebtedness was collateralized with among other things land and personalty owned by Stroud in an individual capacity.

¶ 3 In the latter part of 1987 SCI—at one of its lenders' insistence—sought to have its December 31, 1987 balance sheet audited. It hired the defendant to perform the required accounting in accordance with generally accepted auditing standards [GAAS].[3] Stroud/SCI assert that the audits for 1987 and later years [4] were negligently prepared by Andersen because (1) a substantial misstatement of SCI's liabilities (in excess of three million dollars) went undetected in them and (2) Andersen failed to identify and communicate to SCI that certain of its internal-accounting mechanisms were "material weaknesses" (as that term is understood under GAAS [5]).

¶ 4 Next, plaintiffs assert that it *relied* upon the flawed audited statements of SCI's financial condition to make certain business decisions which ultimately rendered SCI/ICOPS unable to sustain economic viability during the 1990's. Lastly, Stroud/SCI allege that Andersen—after becoming aware of the understatement of SCI's liabilities—failed to extend to its clients (SCI/ICOPS) the duty of care required by the Code of Professional Conduct for accountants.

¶ 5 Andersen defends by asserting (1) that plaintiffs failed to prove by sufficient evidence that its audits of SCI and ICOPS were flawed and (2) that the economic losses suffered by SCI resulted solely from (a) bad management decisions made by Stroud/SCI and (b) SCI's flawed internal accounting procedures.[6] Andersen also contests Stroud's

1. For a discussion of "professionalism", its origins and role in today's society, see Michael J. Polelle, *Who's On First, and What's A Professional*, 33 U.S.F. L.Rev.205 (Winter 1999).

2. The terms of 59 O.S.1991 § 15.1A (16) define "financial statements" as follows:

 "Financial statements" means a written statement and related footnotes purporting to show actual or anticipated financial position, the results of operations, cash flow, or changes in financial position which relate to a specific period of time, on the basis of generally accepted accounting principles. The term "financial statements" also includes specific elements, accounts, or items of such statements, but does not include incidental financial data included in management advisory services, reports or support recommendations to a client nor does it include tax returns and supporting schedules. . . .

3. *See* Pl. Exh. no. 149—December 31, 1987 engagement letter from Andersen to SCI.

4. Stroud engaged Andersen to audit SCI's 1987 balance sheet and the financial statements of (1) Stroud Crop, Inc. for the years ending December 31, 1988 through and including December 31, 1992 and (2) ICOPS for the years ending December 31, 1989 through December 31, 1993.

5. Under applicable GAAS standards a "material weakness" is defined as follows:

 "A material weakness is a reportable condition in which the design or operation of one or more internal control components does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions."

6. At the conclusion of the various audits of SCI prepared by Andersen, the defendant recommended to Stroud/SCI that improvements need-

right as an individual to seek damages for any audit-related injuries. It is Andersen's contention that if the alleged economic injuries were compensable at all, they would be so only to the corporate entity (SCI) and not to its shareholder (Stroud).

¶ 6 Before beginning its deliberations the jury was instructed by the trial judge on negligence, wanton and reckless conduct, and punitive damages among other issues. Jury Instruction No. 16[7] was given at this time which in substance combined what is commonly referred to as the "audit interference rule"[8] with comparative–negligence concepts identified in Oklahoma Uniform Jury Instruction [OUJI–CIV (second)] Instruction No. 9.18. Andersen objects to the trial court's adoption of the audit interference rule asserting that it contravenes the scheme of comparative-negligence enacted in Oklahoma.[9]

¶ 7 At the conclusion of an eleven-day jury trial judgment was awarded to the plaintiffs on a jury verdict. Both compensatory and punitive damages were awarded. Andersen appealed. The Court of Civil Appeals [COCA] held that Jury Instruction No.16 which adopted the audit interference rule represented a fundamental-law error requiring the judgment's reversal. The case was remanded for a new trial.

¶ 8 Appellees sought certiorari which was granted.

## II

## STANDARD OF REVIEW

¶ 9 When the Court is called upon to review a jury's verdict in an action at law, that verdict is conclusive as to all disputed facts and conflicting statements.[10] Where (1)

---

ed to be made in the way the intra-company accounts (between SCI and ICOPS) were maintained. The record reflects that SCI attempted to make some of the recommended changes but not all. The record also reflects that Andersen did not label the identified deficiencies in SCI's accounting system as "material weaknesses" as that phrase is understood under GAAS/GAAP principles.

7. The text of Jury Instruction No. 16 is as follows:

"As a part of its defense, Defendant first denies that any negligence on its part was the direct cause of the occurrence involved in this lawsuit and any resulting injuries to Plaintiffs. Defendant further contends that if, however, the jury should find that it was negligent to some degree, then it is Defendant's contention that Plaintiffs' own negligence exceeded Defendant's negligence, so as to prevent any recovery by Plaintiffs in this lawsuit.

Under the law you may not find the Plaintiffs were negligent unless you also find that Plaintiffs' negligence contributed to Defendant's failure to preform its audit work. This means, however, that Plaintiffs' conduct must have been unreasonable under the circumstances and interfered with Defendant's ability to perform its duty.

If you find that Plaintiffs were negligent under the circumstances described in the above paragraph, then you are to compare the percentage (0%–100%) of negligence of Plaintiffs, if any, with the percentage (0%–100%) of negligence of Defendant, if any. If you find the Plaintiffs' negligence did not contribute to Defendant's failure to perform its audit work then you may not

compare the negligence of the Plaintiffs to the negligence of the Defendant.

The percentage (0%–100%) of negligence you find for each party, under the circumstances described above, should be stated in the appropriate verdict form. The verdict forms have been color-coded to assist you."

8. What today is called the "audit interference rule" found its genesis in the case of *National Surety Corp. v. Lybrand et al.*, 256 A.D. 226, 9 N.Y.S.2d 554 (1939). There the court held, when considering a case premised upon an accountant's negligence, that "[n]egligence of the employer is a defense only when it has contributed to the accountant's failure to perform his contract and to report the truth." 256 A.D. at 236, 9 N.Y.S.2d at 563.

9. See 23 O.S.1991 § 13, which provides in pertinent part:

"In all actions hereafter brought, whether arising before or after the effective date of this act, for negligence resulting in personal injuries or wrongful death, or injury to property, contributory negligence shall not bar a recovery, unless any negligence of the person so injured, damaged or killed, is of greater degree than any negligence of the person, firm or corporation causing such damage, or unless any negligence of the person so injured, damaged or killed, is of greater degree than the combined negligence of any persons, firms or corporations causing such damage."

10. *Hames v. Anderson*, 1977 OK 191, 571 P.2d 831, 833; *Wat Henry Pontiac, Inc. v. Pitcock*, 1956 OK 230, 301 P.2d 203, 204 syl.no. 4.

there is any competent evidence which reasonably supports the jury's verdict and (2) there are no prejudicial errors shown in the trial court's jury instructions, neither the verdict nor the judgment based thereon will be disturbed on review.[11] Further, in the appellate process the Court will not engage in deciding which party produced evidence of the greater weight.[12] The decision—where the preponderance of the evidence lies—is left to the jury which is the exclusive judge of the witnesses' credibility.[13] Lastly, in assaying the evidence's sufficiency to sustain the judgment the Court views all evidence in the light tending to support the judgment, "together with every reasonable inference deducible therefrom, rejecting all evidence adduced by the adverse party which conflicts with it."[14]

¶ 10 When the Court reviews a claimed fundamental-law error in a jury instruction as to which a *timely* objection was not made at trial, we apply a plain error rule and require a showing that the instruction, when given, was erroneous as a matter of law and in effect caused injury, i.e, was demonstrably prejudicial and not just harmless. To justify reversal the party asserting error bears a high burden of proving that the error was obvious or otherwise seriously affected the judicial proceedings' fairness.

¶ 11 Lastly, the trial court's denial of prejudgment interest to Stroud/SCI essentially presents a question of law which is reviewed de novo.[15] An appellate court has plenary, independent and non-deferential authority to reexamine a trial court's legal rulings.[16]

## III

## IT WAS NOT ERROR TO INSTRUCT THE JURY THAT IT COULD COMPARE THE PLAINTIFF'S NEGLIGENCE TO ANDERSEN'S *ONLY* INSOFAR AS IT INTERFERED WITH THE LATTER'S *PROFESSIONAL UNDERTAKING* (i.e., AUDIT)

¶ 12 In today's forensic contest it is necessary to understand the context in which the determinative issues arose before their resolution is addressed. It is only when one realizes that the asserted errors relate to separate components [i.e., liability and damages] of the plaintiff's negligence—action that the Court's pronouncement can be fully appreciated.

¶ 13 To establish a prima facie case of negligence Stroud/SCI must prove: (1) that Andersen owed a duty of care—arising from its rendition of professional accounting services—to the plaintiffs, (2) that the duty was breached, and (3) that injury and the resultant damages were *directly* the result of Andersen's failure to perform its duty.[17] The plaintiffs are required to clear two evidentiary hurdles to be awarded compensatory damages. First, they must prove that Andersen breached that degree of duty which was owed to them and which resulted in their injury. Then they must adduce evidence establishing the amount of compensatory damages which is their due.

¶ 14 Initially, today's pronouncement enunciates the criteria to be used for identifying *the scope of a plaintiff's conduct* which is relevant when a jury decides whether a defendant's conduct is negligent and caused injury. Then we assess whether the plaintiffs met their burden of proof as to damages. When a jury finds the plaintiff has

11. *DeCorte v. Robinson,* 1998 OK 87 ¶ 9, 969 P.2d 358, 360; *Lawton Ref. Co. v. Hollister,* 1922 OK 19, 86 Okla. 13, 205 P. 506 syl.no. 2.

12. *Tapley v. Patton,* 1960 OK 23, 349 P.2d 507, 508.

13. *Holley v. Shepard,* 1987 OK 92, 744 P.2d 945, 947.

14. *Florafax Intl., Inc. v. GTE Market Resources, Inc.,* 1997 OK 7, ¶ 3, 933 P.2d 282, 287.

15. *K & K Food Services, Inc. v. S & H, Inc.,* 2000 OK 31, ¶ 7, 3 P.3d 705; *Keith v. Mid–Continent Petroleum Corp.,* 1954 OK 196, 272 P.2d 371 syl. 2.

16. *Rivas v. Parkland Manor,* 2000 OK 68, ¶ 6, 12 P.3d 452, 455; *Barnes v. Okla. Farm Bureau Mut. Ins. Co.,* 2000 OK 55, ¶ 4, 11 P.3d 162, 166.

17. See *Nealis v. Baird,* 1999 OK 98, ¶ 10, 996 P.2d 438, 455.

proved a prima facie case of negligence, the plaintiff is entitled to recover those damages which are foreseeable and naturally flow from the defendant's negligent acts.[18] In the latter regard it is axiomatic that a defendant is not liable for damages attributable *solely* to the plaintiff's conduct but instead is only liable for those damages which are proved by the plaintiff to extend from the defendant's established breach-of-duty, i.e., negligence. Simply stated, the latter issue is a question of proving one's damages. Assessment of the compensatory damages resulting or flowing from the defendant's negligent conduct presents a factual question which lies squarely within the jury's province.

### A

¶ 15 When a certified public accounting firm is engaged for audit purposes, it is employed to discover "inadvertent errors" in its client's bookkeeping systems and further to protect the client from its own employees' failure to find errors in the company's books and accounting system. Stated in general terms, the auditor is retained to give an opinion whether in conformity with GAAP [Generally Accepted Accounting Principles] the client's financial statements fairly represent its financial position.[19]

¶ 16 A certified public accountant [CPA] owes a different duty of care to his/her client when rendering professional services than the duty of ordinary care which members of society owe to each other. It is Andersen's alleged breach of its professional duty as an auditor which lies at the heart of Stroud/SCI's negligence claim. Hence, the provision

of professional services provides the initial context in which the Court considers SCI's [the plaintiff's] conduct that stands interposed as a defense to Andersen's fault.

¶ 17 The scope of Andersen's duty of care owed as a provider of professional accounting services is established not only by the formalized standards adopted by the American Institute of Certified Public Accounts—i.e., GAAS and GAAP—but also by the Oklahoma statutory and regulatory provisions which govern the field.[20] A CPA's duty to his/her client, while not coterminous with those of lawyers and doctors, is certainly comparable in that violation of the recognized rules governing the profession can be used to evidence a breach of duty in a civil action and can also result in professional discipline.[21] The Court is mindful of the enhanced obligations and responsibilities owed to the public by a person who dons the mantle of a professional.

¶ 18 At trial Andersen sought to assert a comparative-negligence defense[22] to the allegation that it had committed professional malpractice. In essence Andersen requested the trial judge to instruct the jury that the plaintiffs' negligent conduct [if causing more than 50% of its damages] could be used to excuse its own negligent performance of professional duties. The trial judge rejected the defendant's position. Rather the trial judge instructed the jury that as it considered whether Andersen breached a duty of care owed to plaintiffs, it could only consider that negligence of the plaintiff which interfered with the defendant's provision of professional services.

---

18. *See* 23 O.S.1991 § 3, whose terms provide:
 "Any person who suffers detriment from the ... omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."

19. For a general discussion of an auditor's responsibilities, see Kenneth Edward Shore, *Watching the Watchdog: An Argument For Auditor Liability To Third Parties*, 53 SMU L.Rev.387 (Winter 2000). *See also Kemin Industries, Inc. v. KPMG Peat Marwick LLP*, 578 N.W.2d 212, 217 (Iowa 1998).

20. *See* "Oklahoma Accountancy Act", 59 O.S. 1992, § 15.1 A.4. *See also* Okla.Admin.Code §§ 10 et seq.

21. *See Kemin Industries, supra* note 19 at 217.

22. Andersen sought to have the trial court instruct the jury that it could excuse its own conduct as an auditor if the plaintiff's conduct [i.e., negligently keeping the books which Andersen was auditing] caused injury to itself. This is akin to the doctor attempting to excuse the negligent provision of medical services in the emergency room to the accident victim by asserting that it was the plaintiff's own negligence that caused the accident in the first place. Andersen was engaged to audit the plaintiffs' books to find the mistakes and errors in the same.

¶ 19 Andersen did adduce at trial evidence from which the jury could have inferred that Stroud/SCI—independent of the audited financial statements—made several negligent business decisions subsequent to Andersen's first audit [e.g., purchase of building and moving corporate headquarters to Ruidoso, New Mexico from Weatherford, OK] which contributed to SCI and ICOPS' financial woes. In response the plaintiffs adduced evidence—*see* Stroud testimony—upon which the jury could have concluded that Stroud/SCI's allegedly negligent business decisions were made in reliance upon the flawed financial statements which had been audited by the defendant.

¶ 20 Despite the evidentiary conflict over whose conduct caused Stroud/SCI's injury, the jury concluded that plaintiffs did not interfere with Andersen's performance of the respective audits. Andersen offered no instance where it requested something of the plaintiffs regarding the SCI/ICOPS financial statements which was not provided to the audit staff. Even the auditors who participated in the engagement and testified at trial stated that the plaintiff was very cooperative with all of Andersen's requests.

¶ 21 The trial judge correctly understood that circumscribing the use of the adduced evidence of plaintiff's own negligence in regard to the first two evidentiary elements [duty and breach] of a prima facie case of negligence *did not foreclose* Andersen from arguing that the plaintiff's conduct broke the chain of causation as to the injuries/damages which emanated from the defendant's proven negligence.[23] Nor did it preclude Andersen from arguing, as it did at trial, that its acts as an auditor did not *directly* cause the damages for which Stroud/SCI sought compensation.

¶ 22 In our quest to determine the relevance of the plaintiff's conduct to a professional-negligence claim, we find the legal analysis of *National Surety*[24] and the Tenth Circuit of the U.S. Circuit Court of Appeals' decisions in *Fullmer v. Wohlfeiler & Beck*[25] and *Steiner Corp. et al. v. Johnson & Higgins of California*[26] to be persuasive. There the courts held that an accountant could assert as a defense the plaintiff's own negligent acts when such conduct contributed to the accountant's failure to perform his/her work. As noted by the Tenth Circuit, to hold otherwise would render illusory the notion that an accounting firm is negligent when its performance breaches the duty of care it owes as a professional to the public and causes injury. An accountant cannot defend his/her deficient professional conduct by asserting that its client was also negligent unless the client's conduct can be proven to have interfered with the accountant's provision of professional services. Today's clarification of the proof necessary to establish a prima facie case of *professional* negligence does not prevent Andersen from asserting—as it did—that the damages for which Stroud/SCI seek compensation did not flow or result from its [the auditors'] conduct. It does prevent the defendant from excusing its liability for professional negligence by interjecting facts into the trial which are unrelated to the issue of its responsibility for negligently-provided professional services.[27]

¶ 23 For the above reasons, we hold that the Jury Instruction No.16[28] reasonably states the legal standard to be used when a jury assays a *professional's conduct* for purposes of determining whether it is negligent.[29] Since the contested jury instruction correctly states the status of the law in Oklahoma,[30] giving it did not mislead the jury in its assessment whether Andersen's profes-

---

**23.** Andersen requested *no* jury instruction concerning supervening or intervening causation.

**24.** *See* supra note 8.

**25.** 905 F.2d 1394, 1397–98 (10th Cir.1990).

**26.** 135 F.3d 684, 689 (10th Cir.1998).

**27.** *See Fritts v. McKinne,* 1996 OK CIV APP 132, 934 P.2d 371.

**28.** For the text of Jury Instruction No. 16 see *supra* note 7.

**29.** *DeCorte v. Robinson,* 1998 OK 87, ¶ 15, 969 P.2d 358, 362.

**30.** Today's pronouncement is limited in its reach and does not extend to negligence claims asserted against classes of tortfeasors other than professionals.

sional conduct was negligent and does not afford grounds for reversal.[31].

## B

¶ 24 Andersen asserts the adduced evidence was insufficient to establish that it caused plaintiff's injury. Defendant also alleges that the evidence which the plaintiffs used to establish the quantum of its damages was speculative. Resolution of the asserted errors requires we review (1) whether the jury was properly instructed on the issue of the required causal nexus between the defendant's conduct and the plaintiffs' injuries/damages necessary to sustain the jury's verdict and (2) whether reasonable inferences can be drawn from the adduced evidence which support the judgment.

 ¶ 25 An essential element of actionable negligence is that the complained-of conduct be the direct cause of the injury for which compensation is sought.[32] Jury Instruction No. 9—almost a verbatim mirror of OUJI–CIV (second) No. 9.6—correctly outlines what the plaintiffs must prove in order to establish damages. It provides:

Direct cause means a cause which, in a natural and continuous sequence, produces injury and without which the injury would not have happened. For negligence to be a direct cause it is necessary that some injury to a person or to the property of a person in Plaintiff's situation must have been a reasonably foreseeable result of negligence.

 ¶ 26 In a negligence action a plaintiff is required to adduce evidence which (in the trial judge's opinion) is sufficient (1) to induce a reasonable person to believe that a causal link exists between the defendant's conduct and the resulting injury and (2) to establish the presence of a controverted factual question which should be submitted to the jury.[33] If the trial judge—after assessing sufficiency—allows the evidence to reach the jury, the plaintiff bears the burden of persuasion.[34] While Oklahoma's extant jurisprudence allows the required nexus between negligent conduct and injury to be proved by circumstantial evidence, the adduced evidence must have "sufficient probative force to constitute the basis for a legal inference, rather than mere speculation...."[35] The conclusion sought to be proved by the plaintiffs must flow with reasonable certainty and probability from the adduced evidence.[36] In the latter regard the Court's holding in *Hardesty v. Andro Corp.-Webster Div.*, 1976 OK 129, 555 P.2d 1030, 1034 [quoting *Martin v. Griffin Television, Inc.*, 1976 OK 13, 549 P.2d 85, 92] is insightful. There it held:

"The prohibition of recovery of damages because of uncertainty and too speculative in nature applies to the fact of damage and not to the amount of damage."

The parties do not question that Stroud/SCI were in fact injured. The defendant's issue with the jury's verdict and damage-award more particularly addresses who and/or what caused the economic losses which the plaintiffs experienced and how value was ascribed to the injury. It is against these standards that the Court reviews whether the jury's verdict and damage-award are supported by competent evidence.

 ¶ 27 In the present case the jury was required to assess the degree of care utilized by Andersen in meeting its professional obligations to the plaintiffs over approximately a five-year period.[37] The case was presented

---

31. *See CNA Ins. Co. v. Krueger, Inc. of Tulsa,* 1997 OK 142, ¶ 14, 949 P.2d 676, 679.

32. *Graham v. Keuchel,* 1993 OK 6, 847 P.2d 342, 348.

33. *McKellips v. St. Francis Hosp., Inc.,* 1987 OK 69, 741 P.2d 467, 471.

34. *Id.*

35. *Downs v. Longfellow Corp.,* 1960 OK 107, 351 P.2d 999, syl. 2.

36. *Id.* at 1004.

37. Andersen would have the Court in its review of the jury's verdict to focus almost entirely upon the 1988 audit of SCI's 1987 financial audit. The record is devoid of any request by Andersen for special findings requiring the jury to assess the damages incurred on an annual audit-year basis. Such would have been available to Andersen under the provisions of 12 O.S.1991 § 588. Instead Andersen's entire audit engagement extending from 1988 to 1992 was the subject of plaintiffs' action. Andersen cannot now at this stage in the proceedings secure that which it did not ask for at trial.

to the jury on the plaintiffs' theory of causation which is that Andersen owed them a professional duty-of-care which it breached by rendering flawed audits and that in reliance upon Andersen's defective work product Stroud/SCI made several business decisions which resulted in their injury.[38]

¶ 28 The record reflects that ICOPS' December 31,1987 financial statement reflected no liability to the Federal Crop Insurance Corporation [FCIC]—the federal entity through which ICOPS purchased the crop insurance which it sold. There was also evidence adduced that SCI on January 6, 1988 [one week after SCI/ICOPS's 1987 business year closed] drew a check in the amount of $1,009,472.37 for premiums owed by ICOPS, payable to the federal corporation and that Andersen did not verify how this transaction affected the veracity of SCI's 1987 year-end statement of *no liabilities*. The jury was also presented evidence that *after* SCI's internal accounting person [Patti Scott] suggested to Andersen in 1993 that an understatement of the liability owed to the FCIC had existed for several years in the SCI/ICOPS intercompany accounts, Andersen—although paid for its audit of SCI's 1992

financial statements—never furnished the same to SCI. Andersen defended its conduct by asserting that the preconditions for the audit's completion were never met by SCI.[39]

¶ 29 How the jury chose to weigh the various witnesses' testimony is completely within their bailiwick and the Court will not engage in re-weighing the evidence.[40] Nonetheless, the adduced evidence (spanning events occurring over the five-year business relationship between SCI/ICOPS and Andersen) constitutes competent evidence—i.e., evidence upon which the jury reasonably could have concluded—that (1) an indebtedness was owed to FCIC which was inaccurately reflected in the financial statements of SCI and ICOPS that Andersen audited;[41] (2) that the defendant with reckless disregard[42] for its client's welfare failed to exercise that degree of professional judgment required of auditors to discover errors in its clients' accounting systems; and (3) that SCI made several business decisions to its detriment in reliance on the flawed financial statements of its worth. The Court in its review finds that in light of the adduced evidence and the reasonable inferences which can be drawn

---

**38.** Andersen attempts to characterize the theory of causation advanced by the plaintiff as one for "loss of chance", arguing that in effect Stroud/SCI are attempting to recover for economic chances which they lost after they made business decisions predicated upon Andersen's audits. We are not persuaded that the defendant's attempted recharacterization accurately reflects the plaintiffs' primary theory of causation and the evidence which it adduced in support of the same. Hence, we do not have to reach the issue whether the "loss of chance" doctrine applies to negligence actions other than medical malpractice. For a discussion of the "loss of chance" doctrine as adopted in Oklahoma, see *McKellips, supra* note 12 at 471–75.

**39.** One of the preconditions which Andersen wanted satisfied before it would release the audited financial statement was the signing of representation letters by Patti Scott and Stroud. Andersen's request predated by several months the projected completion of the audit. Plaintiffs' expert [Bruce Botwin, a CPA] testified that never in his professional career did he know of an auditor asking for representation letters to be signed before an audit was complete. He described Andersen's conduct as "completely illogical" and inappropriate.

**40.** *Florafax, supra* note 14 at 290.

**41.** There is limited evidence addressing exactly when ICOPS/SCI's indebtedness (of the magnitude here in issue) to FCIC first arose. Nonetheless, there is adduced evidence that such indebtedness existed and was not accurately reflected in the SCI and ICOPS' financial statements which Andersen audited.

**42.** Review of the trial transcript reveals evidence from which the jury could have concluded that Andersen's conduct was wanton and reckless. Plaintiffs adduced evidence that (1) in 1993 when Andersen was presented with evidence of a possible million-dollar audit error, it denied the existence of the same [see Patti Scott testimony TR. pgs. 472–488.]; (2) Andersen made a limited effort to reconcile the accounting discrepancy/error once it was pointed out to them [see TR. pgs. 504–507, 526]; (3) Bruce Botwin, plaintiffs' expert witness, outlined for the jury certain acts of the defendant which he viewed as clearly inappropriate [see TR pgs.628 631, 646–647, 671–673]; (4) an Andersen auditor testified (a) that when confronted with the suggestion there was a mistake in its audits that he and others prepared written analyses of the earlier audits and Patti Scott's work papers and (b) that these written analyses were later destroyed and not made a part of Stroud's files [TR. 1404–1406].

therefrom, there is a competent evidentiary foundation from which the jury could have concluded that Andersen breached the duty of care it owed as a professional auditor to the plaintiffs. The jury's finding—that the defendant breached the duty of care owed to the plaintiffs and thereby caused injury—is supported by competent evidence.

¶ 30 At trial it was acknowledged that valuing damages such as those the result of defendant's breach was not an exact science. Nonetheless, the plaintiff's expert[43] testified as to an approximate range of damages by valuing the two companies [SCI and ICOPS] at different times under different scenarios and was vigorously cross-examined by defendant's counsel concerning the same. Oklahoma's jurisprudence is clear that where there is evidence that the plaintiff has suffered injury and some loss, the jury is the proper vehicle for determining what the loss is from the best evidence of which the case's nature admits.[44] Here the amount awarded as damages by the jury was approximately three million dollars less than the lower range of damages testified to by the plaintiff's expert. The adduced evidence at trial adequately supports such an award.

¶ 31 The Court is also cognizant that the jury found the defendant engaged in wanton and/or reckless misconduct[45] as evidenced by its award of punitive damages.[46] The trial court's instruction to the jury as to punitive damages properly comports with the requirements of Oklahoma's extant jurisprudence. Where the defendant's conduct is found to be wanton or reckless, the jury may not compare the plaintiffs' contributory negligence to either preclude or reduce recovery.[47]

¶ 32 For the above reasons, the plaintiffs' judgment is affirmed both as to proof of liability and the damage-award.

## IV

### STROUD WAS A FORESEEABLE AND KNOWN RELIER UPON THE AUDITS PREPARED BY ANDERSEN AND, HENCE, IS A PROPER PARTY–PLAINTIFF

¶ 33 Defendant objects to the award which the jury made to Steve Stroud individually. Anderson acknowledges that while Stroud is a real party in interest insofar as he is asserting a claim for damages on his own behalf, it owed him no duty since he was never its client. Defendant further asserts that a shareholder cannot assert personal causes for damages occasioned a corporation by breach of a duty owed solely to the company. Andersen's analysis is not persuasive.

¶ 34 The common law remains in full force in Oklahoma unless a statute explicitly provides to the contrary.[48] Further, a presumption favors the preservation of com-

**43.** Plaintiffs' expert was Don Miller, a Certified Financial Planner, a Certified Valuation Analyst and a diplomat of the American Board of Forensic Accountants. All parties agreed that plaintiffs' expert was well qualified.

**44.** *Hardesty v. Andro Corp.-Webster Div.*, 1976 OK 129, 555 P.2d 1030, 1035 [disapproved of on other grounds]; *Southwest Ice & Dairy Prods. v. Faulkenberry*, 1950 OK 100, 203 Okla. 279, 220 P.2d 257.

**45.** The scope of "wanton or reckless" conduct was succinctly stated in *Graham, supra* note 32 at 362. There the Court held:
"The *intent* in *willful and wanton misconduct is not* an *intent to cause the injury;* it is an *intent to do an act*—or the failure to do an act—in reckless disregard of the consequences *and under such circumstances that a reasonable man would know,* or have reason to know, *that such conduct would be likely to result in substantial harm to another.*"

**46.** Jury Instruction No.14 informed the jury that it could not award punitive damages unless it found the defendant's conduct amounted to "wanton or reckless disregard of another's rights." Among other things it provided:
"The conduct of Arthur Andersen & Co. was in wanton or reckless disregard of another's rights if Defendant was either aware, or did not care, that there was a substantial and unnecessary risk that its conduct would cause serious injury to others. In order for the conduct to be in wanton or reckless disregard of another's rights, it must have been unreasonable under the circumstances, and also there must have been a high probability that the conduct would cause serious harm to another person."
The above instruction—given by the trial court—mirrors in significant part OUJI–CIV (second) instruction No. 5.5 and was not objected to by the defendant.

**47.** *Graham,* supra note 32 at 362.

**48.** *Wright v. Grove Sun Newspaper Company, Inc.,* 1994 OK 37, 873 P.2d 983, 987.

mon-law rights.[49] On the issue of third-party reliance on audited financial statements the common-law principle embraced in the Rest. (Second) of Torts § 552 is determinative. The text of that section is:

> One who, in the course of his ... profession ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.... [50]

Under the Restatement test an auditor would be liable to a limited group of people embracing (1) those for whose guidance the auditor intended to supply the audit data and (2) those to whom the auditor knows his client intended to supply the audited financial statements.[51] The record adequately substantiates satisfaction of the common-law rule of liability. Andersen knew that Stroud used his personal assets to cross-collateralize the indebtedness of both SCI and ICOPS. It is certainly foreseeable that in Stroud's business relationships with these related enterprises he would rely upon the audited financial statements which Andersen prepared.[52] It is hard to imagine a more compelling case for application of the § 552 rule. Under the factual circumstances here present Stroud was not only a proper party plaintiff, he also fell with the ambit of that group of persons to whom Andersen owed a duty of care.

### V

### STROUD/SCI ARE NOT ENTITLED TO PREJUDGMENT INTEREST UNDER THE PROVISIONS OF 12 O.S.Supp.1997 § 727 (E)

¶ 35 Plaintiffs' claim that Andersen's negligent conduct injured their "personal rights" thereby entitling them to receive prejudgment interest under the terms of 12 O.S.Supp.1997 § 727 (E).[53] The trial court denied their motion for the same.[54] The Court does not find § 727(E)'s ambit to be as sweeping as the plaintiffs suggest. Were we to extend the reach of § 727's provisions as requested, our decision would have the practical effect of extending the prejudgment-interest allowance to almost every prevailing party in a tort action. Such a result would eviscerate the legislatively-imposed limitations embodied in § 727's provisions.

¶ 36 At common law judgments do not bear interest. Hence, recovery of interest on a judgment must be authorized by statute.[55] The injuries of which both SCI and Stroud complain are injuries to business assets, i.e., property. When in 1984 the Court first considered whether a negligence claim involving an injury to property was a "personal injury" under the provisions of § 727 then in effect, it held it was not and

---

**49.** *Reaves v. Reaves*, 15 Okl. 240, 82 P. 490, 495 (1905).

**50.** The standard of liability reflected in § 552 is clarified in *comment a* to the same. There it is explained that the enunciated common-law principle "implies an undertaking to observe a relative standard, which may be defined only in terms of the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect."

**51.** The latter group would include under the facts of this case not only Steve Stroud individually but also the lending institution who first requested the audited financial statements. Both of these parties were foreseeable and known to Andersen. This conclusion should come as no surprise to anyone as this group, among others, is identified as early as 1924 in Oklahoma's extant jurisprudence as a foreseeable user of audited financial statements. *See State v. Riedell*, 1924 OK 964, 233 P. 684, 688.

**52.** At trial Andersen did not assert that Stroud's reliance upon and use of the audited financial statements was unforeseeable to it.

**53.** The pertinent provisions of 12 O.S.Supp.1997 § 727 (E) are:

> "[I]f a verdict for damages by reason of personal injuries or injury to personal rights including, but not limited to, injury resulting from bodily restraint, personal insult, defamation, invasion of privacy, injury to personal relations, or detriment due to an act or omission of another is accepted by the trial court, the court in rendering judgment shall add interest on said verdict at a rate prescribed pursuant to subsection I of this section from the date the suit resulting in the judgment was commenced to the date of verdict."

**54.** *See* Trial Court's July 17, 1998 order.

**55.** *Sisney v. Smalley*, 1984 OK 70, 690 P.2d 1048, 1050.

that prejudgment interest was unavailable.[56] The statutory amendments to § 727 enacted since then do not persuade the Court that the Legislature intended to extend the Court's earlier definition of "personal" to include injury to property.[57] An economic loss emanating from a business venture does not qualify as a *personal* injury under § 727(E)'s provisions and, hence, does not meet the statutory requirement for an award of prejudgment interest.[58] The trial court's denial of prejudgment interest is sustained.

## VI

## SUMMARY

¶ 37 Today's cause calls upon the Court to review the evidentiary process by which a case alleging accountant-malfeasance is presented to a jury. Appellant would have the Court allow it to present evidence of a plaintiff's conduct—occurring before the defendant's engagement as a certified auditor—as a defense to its negligence. Today's pronouncement holds that an accountant may not defend the beach of a duty of care owed to its client by introducing evidence of the client's conduct unless the latter interfered with the defendant's provision of professional services. The above rule is peculiarly relevant to that trial stage where the plaintiff is establishing a prima facie case of actionable negligence.

¶ 38 The above rule does not preclude the defendant from adducing evidence that the plaintiff's injury did not flow from or was not directly caused by the defendant's conduct. Nor does the announced rule prevent the defendant from asserting supervening or intervening causes, if any there be, which break the chain of causation as to the injury for which the plaintiff is seeking compensation. At trial Andersen did adduce evidence which, if believed by the jury, would have exonerated it of liability for the damages sought by Stroud/SCI. Nonetheless, the jury chose to believe the plaintiffs' evidence and find otherwise.

¶ 39 The Court will not re-weigh the evidence in the case before it. A review of the trial transcript discloses that the ad-

duced evidence along with the reasonable inferences which could be drawn from it sufficiently proves not only the fact of the plaintiffs' injury but also the amount of compensatory and punitive damages which were awarded.

¶ 40 Upon certiorari previously granted, **THE COURT OF CIVIL APPEALS' OPINION IS VACATED AND THE DISTRICT COURT JUDGMENT IS AFFIRMED.**

¶ 41 HARGRAVE, C. J., WATT, V.C.J., HODGES, LAVENDER, OPALA, KAUGER, SUMMERS and BOUDREAU, JJ., concur.

¶ 42 WINCHESTER, J., dissents.

## SUPPLEMENTAL OPINION ON REHEARING

¶ 1 Rehearing is denied. The motion to tax costs in the form of $100.00 certiorari filing fee is granted. Title 20 O.S. Supp. 1996 § 30.4(B); Rule 1.14, Supreme Court Rules, 12 O.S. Supp. 1997, Ch. 15, App. 1; *Sunrizon Homes, Inc. v. American Guaranty Investment Corp.*, 1998 OK 145, ¶ 5, 782 P.2d 103.

---

**56.** *Sisney,* supra note 55 at 1051.

**57.** *See Rainbow Travel Service, Inc. v. Hilton Hotels Corp.*, 896 F.2d 1233, 1243 (10th Cir.1990), for legal analysis of the scope of § 727's prejudgment-interest allowance comparable to that adopted by the Court today.

**58.** To the extent that the Court of Civil Appeals' decision in *Wynn v. Estate of Holmes,* 1991 OK CIV APP 78, 815 P.2d 1231, could be construed to permit a trial court to assess prejudgment interest under § 727's terms for negligent injury to property, it is expressly overruled.