FIRST EQUITY CORPORATION OF FLORIDA, Robert Cornfeld and Floyd Watkins, Plaintiffs–Appellants,

v.

STANDARD & POOR'S CORPORATION, Defendant–Appellee.

No. 598, Docket 88–7788.

United States Court of Appeals, Second Circuit.

Argued Jan. 6, 1989.

Decided March 2, 1989.

Eric Seiler, New York City (Andrew W. Goldwater, Andrea B. Bierstein, Friedman & Kaplan, New York City, of counsel), for plaintiffs-appellants.

Floyd Abrams, New York City (Steven Lieberman, Cahill Gordon & Reindel, New York City, of counsel), for defendant-appellee.

Before KEARSE, CARDAMONE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This case involves the scope of liability for negligent misstatements in the specialized sub-industry that publishes newsletters and provides information services for the use of investors and investment professionals. In particular, it concerns an allegedly misleading summary of the terms of certain convertible securities reported in *Corporation Records*, a guide published by Standard & Poor's, Inc. ("S & P"). Appellants, two Florida investors and a Florida investment advisory firm, claim to have incurred losses exceeding $200,000 as a result of their reliance on the allegedly misleading summary. Following caselaw and applying First Amendment analysis, the district court held that publishers of investment information services like *Corporation Records* would not be liable under Florida or New York law for negligent misstatements. We affirm without reaching the First Amendment issue.

## BACKGROUND

*Corporation Records* is a securities information publication, although somewhat different from many of the publications that have given rise to litigation in the past. It is neither a general-interest newspaper aimed at the investing public, *cf. Gutter v. Dow Jones, Inc.*, 22 Ohio St.3d 286, 490 N.E.2d 898 (1986) (*Wall Street Journal* not liable for inaccurate description of certain corporate bonds), nor an advisory bulletin making specific investment recommendations. *Contrast Gale v. Value Line, Inc.*, 640 F.Supp. 967 (D.R.I. 1986) (publisher of investment advisory newsletter not liable for failure to report critical provision of corporate warrant where newsletter recommended against purchase of such warrant). Rather, *Corporation Records* provides loose-leaf summaries of the business operations and finances of a large number of corporations, without making any investment recommendations or offering any general news reports. With these summaries, *Corporation Records* publishes one clear disclaimer, and one statement that could be read as a disclaimer. The clear disclaimer reads:

> Information has been obtained from sources believed to be reliable, but its accuracy and completeness, and the opinions based thereon, are not guaranteed.

The possible implied disclaimer reads:

> As every effort is made to provide accurate information in this publication, we would appreciate it if subscribers would call our attention to any errors that may occur by communicating with [Standard & Poor's].

There are more than 7500 subscribers, including investment advisers and libraries, to S & P's *Corporation Records.*

Among those subscribers in 1985 was First Equity Corporation of Florida ("First Equity"), an investment banking firm which paid approximately $1300 (a broker's rate) for a one-year subscription. As such, First Equity received the June 1985 issue of *Corporation Records*, which included the following description of certain fifteen percent convertible secured trust notes, issued by Pan American World Airways, Inc. ("Pan Am") and due March 1, 1998 ("the securities"):

> CONVERTIBLE thru maturity or the 15th day preceding earlier/redemption date into Co.'s Com. stock at $5.50 a share, with no adjustment for interest (unless called for redemption after record date and before interest date) or cash dividends.

This description arguably misstated the terms of the indenture relating to the securities in question ("the Indenture"). The securities were both convertible and interest-bearing—that is to say, holders of the securities had the option of either exchang-

ing them for common stock in the issuing company or holding them and receiving interest payments. On thirty days' notice, the securities could be called for redemption by the issuer, which would thereafter pay the outstanding obligation to their holders. After the issuer had called them for redemption, holders retained their conversion rights during the thirty-day notice period. The question leading to the dispute in the instant matter was what the company was obliged to pay to securities-holders who chose to convert during that thirty-day period.

The quoted description in *Corporation Records* could be read to imply that, in the event that the issuer called the securities for redemption after the record date but before the interest date—after the date on which the list of securities-holders became final for purposes of the issuance of an interest check but before the interest payment was actually payable—the issuer would be obliged to exchange the securities of securities-holders who wished to convert into common stock worth the outstanding principal plus the accrued interest on the securities, not merely into common stock worth the outstanding principal alone. Such was not, however, the case. In fact, the Indenture made no provision for the payment of accrued interest upon conversion in the event of redemption between the two dates.[1]

During 1985, Dr. Robert Cornfeld, a client of First Equity but not himself a subscriber to *Corporation Records*, acquired a large position in the securities in question, partly for his own account and partly for the account of one Floyd Watkins. First Equity itself also purchased the securities for its own account, though in smaller quantities. According to Dr. Cornfeld's allegations, which we must assume to be true given the procedural posture of the case, he became concerned about his large investment in the securities as the mid–1985 record date of August 15 and interest date of September 1 approached. He asked the President of First Equity, Alan Pareira, to consult *Corporation Records* in order to ascertain the terms of the securities. Pareira did so, and examined the *Corporation Records'* summary already quoted. On the basis of that summary, Cornfeld and Pareira calculated that, because the securities could be redeemed only on thirty days' notice, and the record date was August 15, redemption announced after July 15 would necessarily fall between the record date and the interest date. As they understood the summary in *Corporation Records*, the securities would be convertible during that period into common shares at the value of principal plus accrued interest. If the securities were not redeemed before September 1, accrued interest would be paid on September 1. Thus, once July 15 had passed, holders of the securities would be guaranteed payment of the full value of their accrued interest. Cornfeld and Pareira accordingly decided to hold the securities they had already purchased and to purchase even more of this "excellent investment."

On July 26, Pan Am announced that it was calling the securities for redemption on August 26. Shortly thereafter, the price of the securities fell. This fall in price followed naturally from the actual terms of the securities' Indenture but obviously did not comport with Cornfeld's understanding of the summary published in *Corporation Records*. That anomaly prompted First Equity to contact John Jantz, an S & P editor. According to First Equity's handwritten notes of a telephone conversation on July 30, Jantz, when asked by First Equity whether *Corporation Records'* summary meant that securities-

---

**1.** The relevant passage in the prospectus for the securities provided that accrued interest would be paid only to securities-holders who, when presenting their securities for conversion, also returned to the issuer checks issued for the amount of the accrued interest:

When Trust Notes [the Securities] are converted after a record date for an interest payment and before the interest payment date, the amount of such interest must accompany Trust Notes surrendered for conversion; otherwise no adjustments in respect of interest or dividends will be made upon the conversion of Trust Notes.

holders were entitled to interest despite the redemption call, said "I'd go on that assumption ... [i]f [the summary] is correct."

The summary was of course not correct. In mid-August, when the appellants converted their securities into common stock, they received stock only at the value of the principal of the securities, with no adjustment for accrued interest. By that time, Dr. Cornfeld had invested more than $3 million in the bonds, while First Equity had invested more than $500,000. They estimate the losses they suffered as a result of their reliance on *Corporation Records* at over $228,000 and $37,000 respectively.

Accordingly, Cornfeld, Watkins and First Equity commenced this action against Standard & Poor's in the Southern District of New York, alleging negligent misrepresentation and fraud. Two proceedings followed. In the first proceeding, *First Equity Corp. v. Standard & Poor's Corp.*, 670 F.Supp. 115 (S.D.N.Y.1987) (*First Equity I*), Judge Goettel dismissed the bulk of appellants' complaint, although he declined to reach constitutional defenses raised by S & P. Judge Goettel held that most of appellants' claims could not be maintained under the tort law of either Florida or New York and that there was thus no need to determine which state's law applied to the dispute. While he found no Florida caselaw directly on point, he held that Florida would follow the rule enunciated in *Jaillet v. Cashman*, 115 Misc. 383, 189 N.Y.S. 743 (Sup.Ct.1921), *aff'd mem.*, 202 A.D. 805, 194 N.Y.S. 947 (App.Div.1922), *aff'd mem.*, 235 N.Y. 511, 139 N.E. 714 (1923), immunizing disseminators of financial information from tort liability for non-defamatory negligent misstatements. Accordingly, he dismissed all of appellants' complaint "except to the extent that [appellants] allege[d] fraud based on actual knowledge" of the alleged falsity of *Corporation Records'* summary. 670 F.Supp. at 119.

After four months of discovery, S & P moved, now before Judge Mukasey, for summary judgment on the remaining issue. Offering no evidence that S & P had "actual knowledge" of the alleged falsity of the summary, appellants argued that Judge Goettel had not in fact held what his opinion appeared unambiguously to hold—namely, that their complaint had been dismissed "except to the extent that [they] allege[d] fraud based on actual knowledge." Rather, appellants, in Judge Mukasey's words, "claim[ed] that at a conference following issuance of the opinion, their counsel advised Judge Goettel that although they had not developed any evidence of actual knowledge, they believed they could establish scienter through proof of recklessness, and that Judge Goettel responded by stating that he had not intended in his opinion to change the common law requirements for fraud." *First Equity Corp. v. Standard & Poor's Corp.*, 690 F.Supp. 256, 258 (S.D.N.Y.1988) (*First Equity II*).

Judge Mukasey did not, however, attempt to determine whether Judge Goettel had intended to make a holding at variance with "his seemingly unambiguous ... opinion." *Id.* at 259. Instead, he departed from tort law analysis and held that "the high degree of scienter imposed by Judge Goettel ... is consistent with well-established First Amendment principles requiring a plaintiff to demonstrate actual malice[,] *id.* at 258, and went on to analyze appellants' claim under First Amendment jurisprudence. He held that the First Amendment required appellants to demonstrate that S & P had published the allegedly false summary "either ... with actual knowledge of its falsity or with reckless disregard of its truth or falsity," and that to show reckless disregard, " '[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' " *Id.* at 259 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)). Appellants not having proffered any evidence sufficient to meet this standard, Judge Mukasey granted summary judgment for S & P.

## DISCUSSION

Like Judge Goettel, we believe this case can be disposed of on tort law grounds and

therefore do not address the First Amendment issue. We also agree with Judge Goettel that pertinent Florida and New York law are identical. We therefore affirm.

Under New York law, as Judge Goettel held, *Jaillet*, 115 Misc. 383, 189 N.Y.S. 743, bars recovery. *Jaillet* involved an investor who suffered losses after relying upon a false report on a stock ticker. Analogizing a stock ticker to a newspaper, the *Jaillet* court held that granting recovery would expose the ticker service to claims by the entire public. Accordingly, "as a matter of practical expediency," the court denied recovery in the absence of privity or fraud amounting to deceit, libel or slander. *Id.* at 384, 189 N.Y.S. 743. We are not persuaded by appellants' attempt to distinguish *Jaillet* by claiming that First Equity's subscription placed it in privity with S & P. We agree with Judge Goettel that "[a] subscriber is not significantly different from other purchasers of a publication merely because he pays for it on a more or less regular basis." *First Equity I*, 670 F.Supp. at 117; *see Gutter v. Dow Jones, Inc.*, 22 Ohio St.3d 286, 490 N.E.2d 898 (1986) (publisher of *Wall Street Journal* not liable to subscriber for non-defamatory negligent misrepresentation relied on by reader in choosing securities investment); *Gale v. Value Line, Inc.*, 640 F.Supp. 967 (D.R.I.1986) (publisher of *Value Line* not liable to subscriber who purchased warrants in reliance on incomplete summary of warrant terms where *Value Line* had recommended against purchase of those warrants).

We draw sustenance for our view of New York law from New York caselaw regarding the liability of accountants for non-defamatory negligent misrepresentations. The New York Court of Appeals, citing *Jaillet*, has thus carefully avoided exposing accountants to liability to a potentially "indeterminate class of persons who, presently or in the future, might ... rel[y]" on a negligently inaccurate audit. *Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 174 N.E. 441, 446 (1931). We believe the instant case involves a factual situation somewhere between that of accountants, which typically entails a report concerning a single company disseminated to an interested public consisting largely of professionals, and that of a newspaper publisher, which entails reports on numerous matters to the general public. *Corporation Records* thus contains information regarding a large number of companies disseminated to an interested public of professionals. We are therefore confident that New York would decline to extend S & P's liability to the full universe of subscribers and readers of *Corporation Records*.

Moreover, the same concerns would bar recovery in New York to the extent that appellants claim recovery on the basis of the July 1985 telephone conversation with John Jantz. Jantz, according to First Equity's handwritten record of the telephone conversation, qualified his statement affirming First Equity's understanding of the disputed summary. According to that record, Jantz said, "I'd go on that assumption ... [i]f [the summary] is correct." (emphasis added). Jantz, by the clear import of his statement, made no representation beyond what was contained in the published summary.

Florida law leads to the same result. In that state, a misrepresentation causing an unprofitable securities investment will not lead to liability unless fraud, as defined under Florida law, is shown. To prove fraud, one must show:

(2) [a] knowledge of the representor of the misrepresentation, or, [b] representations made by the representor without knowledge as to either truth or falsity, or, [c] representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof.

*Kutner v. Kalish*, 173 So.2d 763, 765 (Fla. Dist.Ct.App.) (recovery for fraudulent misrepresentation allowable where plaintiffs, pursuant to alleged misrepresentation, invested funds), *cert. denied*, 183 So.2d 210 (Fla.1965); *cf. Watson v. Jones*, 41 Fla. 241, 25 So. 678 (1899) (action for deceit is sole remedy for misrepresentation); *Atlantic Nat'l Bank of Florida v. Vest*, 480 So.2d 1328 (Fla.Dist.Ct.App.1985), *review*

*denied,* 491 So.2d 281 (Fla.1986), 508 So.2d 16 (Fla.1987); *Federated Capital Corp. v. Florida Capital Corp.,* 280 F.Supp. 301, 301–02 (S.D.N.Y.1968). We have found no Florida case applying the third formulation quoted above to a publication similar to *Corporation Records.*

We believe that Florida would follow prevailing tort law doctrine and deny recovery here. We are not convinced that this case more closely resembles the situation of newspapers rather than that of accountants, and we note that *Jaillet* merely analogized stock tickers to newspapers without equating them. Nevertheless, we believe that the jurisprudence generally applied to newspapers should also apply here. *Cf.* Annotation, Newspaper's Liability to Reader–Investor for Negligent Non–Defamatory Misstatement of Financial News, 56 A.L.R. 4th 1162 (1988). While it is true that Florida has not expressly embraced the rule in *Jaillet,* it has adopted the rule in *Touche,* not only in the area of accountants' liability, *see Gordon v. Etue, Wardlaw & Co., P.A.,* 511 So.2d 384, 389 (Fla. Dist.Ct.App.1987), but also in the analogous area of title abstracters, *see First Am. Title Ins. Co. v. First Title Serv. Co.,* 457 So.2d 467, 472 (Fla.1984). *A fortiori,* therefore, Florida would adopt the *Jaillet* rule with regard to newspaper publishers.

Nor do we perceive any policy reasons that would lead us to anticipate Florida's altering its approach. The publication at issue is a source of information disseminated to a wide public. The class of potential plaintiffs is multitudinous. Even the most careful preparation will not avoid all errors. The potential for meritless or even fraudulent claims is high, and the cost of even successful defenses may be prohibitive if publishers are to be exposed to discovery and trial based solely on allegations that a plaintiff relied upon an erroneous summary.[2] Moreover, such summaries serve numerous purposes, with greatly varying risks so far as inaccuracies are involved. Users of *Corporation Records* are well aware that the summaries involve thousands of complicated financial documents and are thus often only the starting point for research rather than the finish line. Appellants' position mistakenly treats such summaries as a substitute for the originals and ignores the fact that users can easily protect themselves from misstatements or inaccuracies by examination of the original documents or federally required prospectuses. In such circumstances, we believe that a user is in the best position to weigh the danger of inaccuracy and potential loss arising from a particular use of a summary against the cost of verifying the summary by examination of the original documents or prospectus. *See generally* Calabresi and Hirschoff, *Toward a Test for Strict Liability in Torts,* 81 Yale L.J. 1055 (1972). That being the case, the user should bear the risk of failing to verify the accuracy of a summary in the absence of proof of a knowing misstatement.

AFFIRMED.

---

2. We also draw support from *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Appellants in the instant matter claim damages for losses resulting not only from their purchases of the securities, but also from their decision to hold the securities. Under *Blue Chip,* plaintiffs suing under Section 10(b) of the Securities Exchange Act of 1934 may recover only for losses that result from decisions to buy or to sell, not from decisions to hold or refrain from trading. The Court's decision in *Blue Chip* was in part motivated by precisely the same fears of potentially unlimited liability that motivated New York's *Jaillet* and *Touche* decisions. *Id.* at 748, 95 S.Ct. at 1931 (quoting *Touche,* 174 N.E. at 444).