2004 OK CIV APP 56

**COMMERCIAL FINANCIAL SERVICES, INC., as Debtor in Possession, Plaintiff,**

**v.**

**ARTHUR ANDERSEN LLP, Defendant and Third–Party Plaintiff/Appellant/Cross–Appellee,**

**v.**

**Standard & Poor's Rating Services, a division of The McGraw–Hill Companies, Inc., Moody's Investors Service, Inc., Third–Party Defendants/Appellees,**

**and**

**Fitch Investors Services, L.P., Duff & Phelps Credit Rating Company, Third–Party Defendants/Appellees/Cross–Appellants,**

**and**

**William R. Bartmann and Jay Jones, Third–Party Defendants.**

**No. 99,546.**

Court of Civil Appeals of Oklahoma, Division No. 4.

April 6, 2004.

Certiorari Denied June 14, 2004.

J. Douglas Mann, John E. Howland, Rosenstein, Fist & Ringold, Tulsa, OK and Eliot Lauer, Jeffrey I. Zuckerman, Curtis, Mallet–Prevost, Colt & Mosle LLP, New York, NY, for Defendant and Third–Party Plaintiff/Appellant/Cross–Appellee.

Phillip T. Bruns, Robert J. Madden, Gibbs & Bruns, L.L.P., Houston, TX and James C. Lang, Brian T. Inbody, Sneed & Lang, P.C., Tulsa, OK, James L. Costner, Joshua M. Rubins, Satterlee Stephens, Burke & Burke,

New York, NY, for Third–Party Defendant/Appellee Standard & Poor's Rating Services.

John N. Hermes, McAfee & Taft, P.C., Oklahoma City, OK, for Third–Party Defendant/Appellee Moody's Investors Service.

Evan A. Davis, Carmine Bocuzzi, Anil Kalhan, Cleary, Gottlieb, Steen & Hamilton, New York, N.Y. and Laurence L. Pinkerton, Judith A. Finn, J. David Jorgenson, Pinkerton & Finn, P.C., Tulsa, OK, for Third–Party Defendants/Appellees/Cross–Appellants Fitch Investors Services and Duff & Phelps Credit Rating.

Opinion by JERRY L. GOODMAN, Judge.

¶ 1 Arthur Andersen, LLP, appeals the trial court's grant of motions to dismiss filed by third-party defendants Standard & Poor's Ratings Services, Moody's Investors Service, Inc., and Fitch, Inc., a successor to Fitch Investors Services, L.P. and Duff & Phelps Credit Rating Company (collectively, the Rating Agencies). Andersen, an accounting firm, has been sued by Commercial Financial Services, Inc., (CFS) for professional malpractice. Andersen asserted a right of contribution against the Rating Agencies, which gave favorable ratings to securities sold by CFS trusts. This appeal was assigned to the accelerated docket pursuant to Oklahoma Supreme Court Rule 1.36(a)(2), 12 O.S.2001, ch. 15, app. 1. Based on the facts and applicable law, we affirm in part, reverse in part, and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶ 2 CFS is a debt purchasing and collecting company. Purportedly once the world's largest purchaser and servicer of defaulted credit card receivables, the company filed for Chapter 11 bankruptcy in late 1998.

¶ 3 In the mid–1990's, CFS changed its operations by using "asset securitization." In this connection, CFS purchased, at a significantly discounted price, bad debts previously charged off by banks and credit card companies. It would then pool these accounts, sell them to an affiliated entity, who in turn sold them at a profit to a trust. The trust then issued and sold securities in the form of notes and certificates, which were secured by the accounts and paid from the stream of income derived from collections of the pooled bad debts. Collections were handled by CFS, which charged a fee to do so.

¶ 4 Between 1996 and 1998, over a billion dollars was raised through asset securitizations by a series of trusts. Eventually, CFS was unable to collect enough money from the bad debtors to meet the cash flow required to repay the purchasers of the notes, which led to the company's failure.

¶ 5 CFS sued Andersen, an accounting firm it had hired, asserting Andersen gave it negligent advice and encouragement, failed to properly audit financial statements by overstating assets and understating liabilities, and lulled CFS into a false sense of security about its financial condition. In particular, CFS asserted the failure of the asset securitization plan was due to Andersen's facilitation of the creation of the plan and failure to warn CFS that it would be unable to sufficiently collect from the supporting collateral. Among other things, CFS asserted Andersen failed to exercise "professional skepticism."

¶ 6 Andersen answered, asserting that CFS was responsible for its own condition due to the fraudulent conduct of management. For example, Andersen asserted CFS funneled cash to another company to expedite the purchase of the accounts receivable owned by the trusts and make it appear as if the plan were succeeding.

¶ 7 The subject of this appeal is Andersen's third-party petition for contribution from the Rating Agencies, which are nationally recognized statistical rating organizations. The Rating Agencies were employed by CFS to rate the various certificates issued by the trusts. Their ratings were favorable, through designations such as "A" or "investment-grade." Andersen argued the Rating Agencies were negligent in giving the securities such high ratings. Andersen further argued the asset securitization plan was dependent on those ratings, so that if the ratings had not been favorable, the plan could never have been implemented. Andersen asserted the Rating Agencies made negligent

misrepresentations and omissions to CFS regarding the securities' risk and profitability. Andersen pled claims of negligent misrepresentation and negligence by the Rating Agencies to CFS, pursuant to 12 O.S.2001 § 832(A).[1]

¶ 8 The Rating Agencies filed motions to dismiss, which the trial court granted. In its journal entry, the trial court found:

(1) the ratings were opinions protected by the First Amendment, subject to the standard of actual malice used in libel cases;

(2) the Rating Agencies owed no duty to CFS as a matter of law;

(3) the purpose of the ratings was to advise investors, and not CFS, so the ratings were not for the "benefit and guidance" of CFS as required by the Restatement (Second) of Torts § 552;

(4) CFS could not profit from its own wrongs, so any CFS claims against the Rating Agencies should be dismissed as a matter of law;

(5) Andersen could not prove reliance by CFS.

¶ 9 The trial court also denied Andersen's request to amend pursuant to what is now 12 O.S. Supp.2003 § 2012(G), on the ground that adding a malice element would be futile and untimely. The trial court rejected several additional arguments by the Rating Agencies, including the argument that 12 O.S.2001 § 832 excluded contribution claims based on purely economic loss. The trial court included in its order language in compliance with 12 O.S.2001 § 994(A) in order to expedite this appeal.

¶ 10 Andersen appeals, and third-party defendant Fitch cross-appeals. Even though the trial court granted its motion to dismiss, Fitch asserts the trial court erred by finding 12 O.S.2001 § 832 did not bar recovery for contribution on purely economic terms, and by failing to address Fitch's argument that for a putative negligent misrepresentation to be actionable under § 552 of the Restatement, the misrepresentation must have been intended for a limited group of persons, as opposed to the investing public at large.

## STANDARD OF REVIEW

¶ 11 Because the motions to dismiss included evidentiary materials outside the pleadings not excluded by the trial court, we treat the trial court's decisions as the grant of summary judgment to the Rating Agencies. *See* 12 O.S. Supp.2003 § 2012(B). Summary judgment is appropriate where there is no dispute as to any material fact, *Indiana Nat'l Bank v. State Dept. of Human Servs.*, 1993 OK 101, ¶ 10, 857 P.2d 53, 59, and where one party is entitled to judgment as a matter of law. *Sellers v. Okla. Pub. Co.*, 1984 OK 11, ¶ 23, 687 P.2d 116, 120. We therefore review the trial court's decision de novo. *Young v. Macy*, 2001 OK 4, ¶ 9, 21 P.3d 44, 47.

## ANALYSIS

¶ 12 We have analyzed each reason given by the trial court for granting the motion to dismiss, as well as those additional reasons raised in the cross-appeal. For the following reasons, we believe dismissal was inappropriate.

### *Opinion and the First Amendment*

¶ 13 The trial court held the ratings were opinions protected by the First Amendment, subject to the standard of actual malice used in libel cases. In defamation cases applying a statutory privilege, Oklahoma courts have stated that an opinion is incapable of being "false." *Hennessee v. Mathis*, 1987 OK CIV APP 35, ¶ 11, 737 P.2d 958, 962. The Rating Agencies assert that the ratings of the certificates were opinions, and thus not subject to the negligence standard.

¶ 14 The Rating Agencies' ratings fall somewhere between those opinions which receive constitutional protection and those that do not. On the one hand, editorial writers and private citizens are generally

1. "When two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them except as provided in this section."

free to speak their mind regarding public officials' conduct without having to fear a lawsuit. *See, for example, Gaylord Entm't Co. v. Thompson,* 1998 OK 30, 958 P.2d 128. On the other hand, a lawyer issuing a title opinion is not automatically exempt from a negligence lawsuit simply because the lawyer is giving an "opinion." *See, for example, Great Plains Fed. Savs. & Loan Ass'n v. Dabney,* 1993 OK 4, 846 P.2d 1088.

¶ 15 The Rating Agencies rely heavily on a 10th Circuit Court of Appeals decision, *Jefferson County School District No. R–1 v. Moody's Investor's Services, Inc.,* 175 F.3d 848 (10th Cir.1999). In that case, the school district brought bonds to market. Moody's, a rating agency, published an article regarding the bonds in an electronically distributed information service sent to subscribers and news services. The article gave the bonds and the school district's financial condition negative evaluations, which affected the bonds' value and ultimately caused the district to re-price the bonds at a higher interest rate, costing the district money. *Id.* at 850–51.

¶ 16 The 10th Circuit affirmed the trial court's dismissal of the district's lawsuit. The Court noted that it had long been the rule, as articulated by the U.S. Supreme Court in First Amendment cases including *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), that a statement "of opinion relating to matters of public concern which does not contain a provably false factual connotation" will receive full constitutional protection. *Id.* at 851. The Court then held the combination of the district's failure to identify a specific false statement reasonably implied from Moody's article, plus the vagueness of the phrases used by Moody's, resulted in the article and the rating being protected expressions of opinion. *Id.* at 856.

¶ 17 There is a crucial distinction between *Jefferson County* and the instant case. In *Jefferson County,* Moody's published its opinion for the benefit of subscribers and news services. "[I]t had not been asked to rate the bonds." *Id.* at 850. By contrast, in the instant case the Rating Agencies *had* been asked to rate the bonds, at CFS's request and at CFS's expense.

¶ 18 It is reasonable to assume that CFS was paying for something when it asked the Rating Agencies to rate the bonds. What it was paying for was their opinion as to the bonds' worthiness. This fact distinguishes the instant case from *Jefferson County.* While the Rating Agencies gave "opinions," they did so as professionals being paid to provide their opinions to a client. If a journalist wrote an article for a newspaper about the bonds, the First Amendment would presumably apply. But if CFS hired that journalist to write a company report about the bonds, a different standard would apply. Similarly, CFS and the Rating Agencies can be said to be in privity through an agreement that both sides are entitled to enforce.

¶ 19 We have considered whether it is any less of an "opinion" because the opinion maker is being paid by and is in privity with the entity who may assert it is not getting that for which it paid. We believe the relationship between these parties goes beyond a relationship between a journalist and subject, and is more analogous to that of a client and the client's certified public accountant. *See Stroud v. Arthur Andersen & Co.,* 2001 OK 76, 37 P.3d 783. We do not believe the First Amendment shields the agencies from potential liability.

*Duty and the First Amendment*

¶ 20 The trial court also granted the motions to dismiss because it held the Rating Agencies owed CFS no duty as a matter of law. The threshold question in any suit based on negligence is whether the defendant had a duty of care to the particular plaintiff alleged to have been harmed. *Haas v. Firestone Tire & Rubber Co.,* 1976 OK 178, ¶ 14, 563 P.2d 620, 625. Duty of care is a question of law, and thus was properly a matter for the trial court to determine. *Delbrel v. Doenges Bros. Ford,* 1996 OK 36, ¶ 7, 913 P.2d 1318, 1320–21.

¶ 21 We cannot accept the argument that having agreed to rate the bonds for a fee, the Rating Agencies owed no duty of care to CFS, the entity paying for the rating. A typical letter from a rating agency to CFS

outlines the parties' relationship. It states that the rating of the certificates was being made pursuant to a request by CFS; that the rating was based on information furnished by CFS/the trusts; that the rating was favorable; that the rating could be disseminated to interested parties (though the certificates were to be placed privately) and that the agency retained the right to advise the public of the rating; that the rating did not constitute a recommendation to buy, sell, or hold the certificates; and that a bill for the agency's work would be sent to CFS.

¶ 22 The parties agreed that the Rating Agencies would give their opinions as to the worthiness of the certificates. The agencies did not promise to give a certain rating, but it is implicit in the parties' business relationship that the rating would be made in a non-negligent way. This is the essence of Andersen's third-party petition: that the Rating Agencies committed negligence by breaching a duty to CFS not to supply false and misleading statements or omissions in connection with the ratings.

¶ 23 It is true that in supplying a rating, the rating agencies also serve the public interest. As explained in a law review article on the subject, "The bond rating services are popular with investors because they can rate securities' riskiness far less expensively than can an individual investor. The information the services provide improves the market's efficiency by equalizing prices at the margin so that the securities more accurately affect the market's collective preference for the risk." Gregory Husisian, *What Standard of Care Should Govern the World's Shortest Editorials? An Analysis of Bond Rating Agency Liability,* 75 Cornell L.Rev. 411, 413 (1990) (footnotes omitted). The article goes on to cite a number of decisions for the proposition that bond rating services receive the same full First Amendment protection afforded other media such as newspapers for negligent non-defamatory misstatements of fact. *Id.* at n. 16; *see, for example, First Equity Corp. of Fla. v. Standard & Poor's Corp.,* 869 F.2d 175, 180 (2d. Cir.1989).

¶ 24 In a footnote, the *Jefferson County* decision referred to the Cornell law review article as follows:

> Assessing the other possible causes of action against bond rating agencies like Moody's, one commentator has concluded that the tort of negligent misrepresentation should not be extended to them:
>
> Courts cannot constitutionally allow recovery on any showing less than recklessness because of the potential chilling effect that imposing a negligence standard would have on rating publications. Given the importance of financial information to investors and the economy as a whole, bond rating constitutes a matter of "public concern." Applying traditional first amendment law, the state's interest in compensating relying investors must give way to the first amendment's concern for the free flow of commercial information. Society must rely on the market and competition to keep rating agencies operating at their negligence threshold, not on courts and juries. Husisian, *supra,* at 460.

*Jefferson County,* 175 F.3d 848 at note 3.

¶ 25 We have examined the cases cited in the law review article in support of its thesis. These cases are distinguishable from the facts in the case before us for the same underlying reason that *Jefferson County* is distinguishable. *First Equity Corp. of Fla. v. Standard & Poor's Corp.,* 869 F.2d 175 (2d Cir.1989), involved a lawsuit by subscribers to Standard & Poor's securities information publication that allegedly misstated the terms of an indenture relating to securities. The Second Circuit affirmed a motion to dismiss on tort law grounds without addressing First Amendment issues. *Id.* at 178–79. The Court placed Standard & Poor's somewhere between an accountant and a general interest newspaper publisher, and concluded that the protection granted the latter should apply. The Court rejected the argument that a subscriber was in privity with the newsletter, theorizing that "[a] subscriber is not significantly different from other purchasers of a publication merely because he pays for it on a more or less regular basis." *Id.* at 179.

¶ 26 In another case cited in the article, *Daniel v. Dow Jones & Co.,* 137 Misc.2d 94, 520 N.Y.S.2d 334 (N.Y.City Civ.Ct.1987), the trial judge dismissed a lawsuit filed by an

investor who subscribed to the Dow Jones News/Retrieval service. The investor asserted he relied on the electronic service's erroneous omission of the fact that prices regarding a transaction were in Canadian and not United States dollars. The trial judge granted a motion to dismiss on both First Amendment and tort law grounds. Regarding the latter, the judge essentially held the service owed no duty to the subscriber regarding the information. But the court noted the result might be different under New York law if the parties were in a "special relationship," and that this rule applied despite the weakening of the rule of privity. *Id.* at 337.

¶ 27 In the instant case, there *is* a special relationship between the parties. The relationship is spelled out in the communications and dealings between the parties, as detailed above. The Rating Agencies cannot be said to have no greater duty than that owed to a reader of a general interest newspaper or a subscriber of a specialist newsletter. There is no Oklahoma authority, either in the statutes or caselaw, for the proposition that an exception to the traditional rules of negligence should apply here to shield the Rating Agencies.

¶ 28 The strongest argument for granting the motions to dismiss may well be one of public policy. The public depends on rating agencies for accurate, useful advice in making investment decisions. A legitimate concern exists that applying the negligence standard may pressure the agencies into issuing a more favorable rating than is deserved (and not a less favorable one, as Andersen asserts the agencies should have done in this case) out of fear of a lawsuit brought by the security's issuer. Nonetheless, while the Rating Agencies did not owe CFS a duty to issue the rating CFS might have wanted, they did owe it a duty to issue the rating the securities deserved.

*The Restatement's "benefit and guidance"*

¶ 29 The trial court also held that the purpose of the ratings was to advise investors and not CFS, so the ratings were not for the "benefit and guidance" of CFS as required by the Restatement (Second) of Torts § 552 (1977).[2]

¶ 30 As previously explained, the ratings could be said to benefit investors. But unquestionably, they also benefitted CFS. The ratings were made solely at the behest of CFS, in exchange for a fee paid by CFS. We cannot accept the argument that the entity which paid for the service and would presumably use and in fact publish the information would be excluded from the Restatement's coverage. In fact, the Restatement itself resolves this argument. Comment (h) to § 552 states, in relevant part:

> It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. . . .

¶ 31 Unquestionably, the Rating Agencies intended the ratings to reach and influence CFS. Even if the ratings had been negative, they would still be for the "benefit and guidance" of CFS. We therefore reject this argument.[3]

2. Section 552(1) states:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

In relevant part, § 552(2) limits liability to loss suffered "by the person or one of a limited group of persons for whose benefit and guidance" the information is intended to be supplied.

The Oklahoma Supreme Court applied § 552 in *Stroud v. Arthur Andersen & Co.*, 2001 OK 76, ¶ 34, 37 P.3d 783, 793–94, an accountant negligence case.

3. We note that the Restatement provides support for our analysis of the First Amendment and duty arguments. Comment (c) to § 552 states that the rule applies only when the defendant has a pecuniary interest in the transaction in which the information is given. Comment (d) states that this interest "will normally lie in a consideration paid to him for it. . . ." Indisputably, the Rating Agencies were paid a consideration by CFS.

*CFS's "own wrongs"*

¶ 32 The trial court further held CFS could not profit from its own wrongs, so any CFS claims against the Ratings Agencies would be dismissed as a matter of law. There is a good deal of argument in the record regarding whether CFS gave false information to the agencies and committed fraud in its financial dealings. However, at this point, the record certainly does not establish without a doubt that CFS is guilty of such conduct, much less that its actions preclude the possibility of recovery. Dismissal of the lawsuit at this point in the proceedings on this ground is not warranted.

*Reliance*

¶ 33 The trial court also held Andersen could not prove reliance by CFS. It may be that at some point in the proceedings, the evidence will show a lack of causation. Again, at this stage of the proceedings, this is a matter that must be developed further and is not an appropriate ground for dismissal.

*12 O.S.2001 § 832's Injury to Property*

¶ 34 We have considered two other grounds for dismissal, which have been raised by Fitch in its cross-appeal. We conclude the trial court correctly rejected these arguments.

¶ 35 First, Fitch asserts the trial court erred by finding 12 O.S.2001 § 832 did not bar contribution claims for purely economic loss. As cited earlier in this opinion,[4] a right of contribution exists for joint or several liability in tort "for the same injury to person or property...." Fitch argues this case does not involve "property" because it involves only pure economic loss. It appears Fitch's view would prevail in New York, where the courts have held that their contribution statute (which, like Oklahoma's, covers personal injury, injury to property, and wrongful death), does not permit a claim for contribution where damages are purely for economic loss. *See Scalp & Blade, Inc. v. Advest, Inc.,* 300 A.D.2d 1068, 755 N.Y.S.2d 140 (N.Y.App.Div.2002).

¶ 36 However, Oklahoma statutes define "property" to include both real and personal property, and define "personal property" to include money, goods, chattels, things in action, and evidences of debt. 25 O.S.2001 § 26. In the absence of any Oklahoma authority to the contrary, we do not believe the Legislature meant to exclude "money" from its definition of property in § 832. We therefore reject this argument.

*The Restatement's "Person/Limited Group" Requirement*

¶ 37 Fitch also asserts the Restatement (Second) of Tort's § 552 requires the misrepresentation to have been intended for a limited group of persons, as opposed to the investing public at large. As found earlier in this opinion,[5] § 552's applicability of the tort of negligent misrepresentation is limited in relevant part to losses suffered "by the person or one of a limited group of persons" who the supplier of the false information intends to supply. Fitch asserts because the rating could reach a potentially limitless audience, § 552 cannot apply.

¶ 38 The answer to this argument is that no matter who else might eventually learn of the rating, the rating was clearly intended for CFS. As explained above, the communications between the parties unquestionably show the rating was done at CFS's request, and the information concerning the rating was communicated by the agencies to CFS. Section 552's comment g., in fact, states in relevant part:

> The person for whose guidance the information is supplied is often the person who has employed the supplier to furnish it, in which case, if it is supplied for a consideration paid by that person, he has at his election either a right of action under the rule stated in this Section or a right of action upon the contract under which the information is supplied.

¶ 39 CFS employed the Rating Agencies to furnish the information for a consideration.

4. *See* note 1.

5. *See* note 2.

Fitch's argument that the Restatement does not apply is therefore rejected. We affirm the portions of the trial court's decision rejecting Fitch's additional grounds for dismissal, which were raised in Fitch's cross-appeal.

CONCLUSION

¶ 40 We express no opinion on whether the Rating Agencies are ultimately liable for contribution, as our opinion is limited to the matter of whether the trial court's grant of the motions to dismiss was legally correct. For the reasons given, we affirm in part, reverse in part, and remand for further proceedings.

¶ 41 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.

TAYLOR, P.J., and STUBBLEFIELD, J., concur.